**Lewis Eugene GILBERT, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–96–31.

Court of Criminal Appeals of Oklahoma.

Nov. 20, 1997.

Rehearing Denied Feb. 3, 1998.

Mark Barrett, Mike Wilson, Oklahoma Indigent Defense, Norman, for Appellant at trial.

Tim D. Kuykendall, District Attorney, R. Richard Sitzman, Assistant District Attorney, Norman, for the State at trial.

Anne Moore, Oklahoma Indigent Defense, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, William L. Humes, Assistant Attorney General, Oklahoma City, for the State on appeal.

## OPINION

LUMPKIN, Judge.

Appellant Lewis Eugene Gilbert was tried by jury and convicted of First Degree Malice Aforethought Murder (Count I) (21 O.S.1991, § 701.7), Kidnapping (Count II) (21 O.S.1991, § 741), Robbery with Firearms (Count III) (21 O.S.1991, § 801), Case No. CF–94–1125, in the District Court of Cleveland County. In Count I the jury found the existence of two (2) aggravating circumstances and recommended the punishment of death. In each of Counts II and III, the jury recommended as punishment life imprisonment and fines of ten thousand dollars ($10,000.). The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[1]

Appellant and co-defendant Eric Elliott[2] were convicted of the premeditated murder of Roxanne Ruddell, a security guard at Lake Stanley Draper. Appellant and Elliott were in the midst of a multi-state crime spree when they arrived in Oklahoma. They had killed an elderly lady in Ohio and stolen her car which they drove to Missouri. There, they killed an elderly couple and stole their car which they drove to Oklahoma. Driving that car to the area near Lake Stanley Draper, Appellant and Elliott saw the victim fishing alone near Point 6. Intending to steal her pickup, the defendants tied the victim's hands, made her walk a short distance and sit in the "v" at the base of a tree. Appellant then shot her three times in the head. Approximately three days later, Appellant and Elliott were apprehended in New Mexico sleeping in a ditch. The victim's pickup was found approximately one mile away.

## PRE–TRIAL ISSUES

Appellant contends in his second assignment of error that the trial court erred in refusing to order a competency evaluation. Appellant asserts such an evaluation was warranted as sufficient evidence had been presented to raise a reasonable doubt as to his competency to stand trial. In the first part of his five part argument, Appellant contends that Oklahoma's procedures mandated a court-ordered evaluation before trial to protect his fundamental due process right to be tried while legally competent.

An accused is presumed to be competent to stand trial and has the burden of proving his incompetence. *Bryson v. State*, 876 P.2d 240, 249 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995). If the defendant makes a threshold showing that he is incompetent by the filing of a proper application, the court must hold a hearing to examine the application. *Cargle*

1. Appellant's Petition in Error was filed in this Court on June 24, 1996. Appellant's brief was filed January 6, 1997. The State's brief was filed May 6, 1997. The case was submitted to the Court on May 12, 1997. Appellant's reply brief was filed May 27, 1997. Oral argument was held September 2, 1997.

2. Co-defendant Elliott appeals separately.

*v. State*, 909 P.2d 806, 815 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). The test to be used at that hearing is whether the accused has sufficient ability to consult with his lawyer and has a rational as well as actual understanding of the proceedings against him. *Bryson*, 876 P.2d at 249. The determination of whether a sufficient doubt has been raised regarding a defendant's competency is left to the trial judge. *Id.* Such determination is based upon the particular facts and circumstances of each case. *Id.* The trial court is not required to give controlling effect to the opinions of experts, but may rely on the opinion of lay witnesses and the court's own observations of the defendant. *Id., Cooper v. State*, 889 P.2d 293, 304 (Okl.Cr.1995), *overruled on other grounds, Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). If the court finds the application raises a doubt regarding the defendant's competency, an order for an examination by qualified medical personnel is entered. *Cargle*, 909 P.2d at 815.

As this illustrates, our state procedures mandate a court-ordered evaluation only when sufficient doubt as to the defendant's competency to stand trial has been raised, thereby ensuring the defendant's due process rights to be tried while legally competent. As we will see in addressing the second portion of Appellant's argument, a sufficient doubt as to competency was not raised in this case.

Pursuant to 22 O.S.1991, § 1175.3, Appellant filed a motion for determination of competency, a hearing was held by the trial court and the application examined to determine whether sufficient facts had been alleged to raise a doubt as to Appellant's competency to stand trial. In support of the application, defense counsel expressed his belief that the defendant was unable to have a reasonable degree of understanding about how his trial would proceed, that he (counsel) and others had attempted to educate the defendant about the court process and his understanding had improved, but counsel believed that the degree of understanding was insufficient to enable the defendant to adequately assist at trial. Counsel also noted that the defen-

dant was "unable to consistently pay attention to matters at hand" and counsel believed the defendant would be unable at trial to focus his attention as needed on testimony and, therefore, the defendant would be "de facto absent." Counsel also stated the defendant's educational background and intellectual ability was limited and such affected his ability to assist counsel; and that the defendant had control problems which might result in inappropriate behavior at trial and that, although the defendant sometimes had a great interest in the case, he was often unable to understand the basis of what happens in court or regarding his case in general.

A hearing on this application was held and Appellant presented one witness, Luther Grisso, an investigator with the Oklahoma Indigent Defense System. Mr. Grisso testified that his training in competency determinations and mental illness came from seminars, conferences and workshops. He stated that he had visited Appellant on four or five occasions during the past year and had reviewed his medical records. This had led him to doubt Appellant's competency to stand trial. Mr. Grisso stated that Appellant did not understand what had transpired in court during a previous hearing, that Appellant did not understand that a jury would be in the courtroom or what their function was to be. He testified to records which showed Appellant had been in a special education program in school and that he possessed a low I.Q. Grisso stated he believed Appellant could not pay attention throughout the course of the trial and that he might display inappropriate behavior.

On cross-examination, Mr. Grisso admitted that in every case in which he had concluded the defendant was incompetent to stand trial, none had been found to be so by a jury. He stated that a review of Appellant's medical records gave no indication Appellant had at any time been prescribed medication, and Appellant was not, to the best of his knowledge, taking medication at the present time.

After hearing testimony and argument, the trial court found the application for determination of competency alleged no facts "which raised any doubt in the Court's mind as to

Mr. Gilbert's legal competency as defined in 22 O.S.1991, § 1175.1" and that Mr. Grisso's testimony failed to "present any facts to raise a doubt in the Court's mind as to Mr. Gilbert's legal competency as defined in 22 O.S. 1991, § 1175.1" and that "taken together, the application and the testimony do not raise such doubts." The court stated that its findings were based upon the testimony presented at the hearing as well as its own knowledge of the defendant as obtained through personal observation of him at the arraignment, an earlier motion hearing and the hearing at hand.

The standard of review on appeal is whether there is any competent evidence reasonably supporting the trier of fact. *Bryson,* 876 P.2d at 249. When the issue of competency is tried before a judge, his finding will not be disturbed on appeal if it is supported by sufficient evidence. *Id.* Here, the record clearly supports the trial judge's decision.

Title 22 O.S.1991, § 1175.2 provides in pertinent part

The application for determination of competency shall allege that the person is incompetent to undergo further proceedings, and **shall state facts sufficient to raise a doubt as to the competency of the person.** (emphasis added).

In *Cargle,* the term "doubt" (as used with competency and sanity), was discussed. Quoting *Reynolds v. State,* 575 P.2d 628 (Okl. Cr.1978), this Court stated:

It is well-settled in Oklahoma that the doubt referred to in the statute is that doubt which must arise in the mind of the trial court. The trial court may look to the source of the information and motive in determining whether there is doubt which would justify a sanity hearing, and the existence of a doubt as to defendant's sanity must arise from facts of a substantial nature. There must exist reasons to believe that the defendant's claim of insanity is genuine and not simulated to delay justice, and the finding of the trial court will not be disturbed on appeal unless a clear abuse of discretion is shown.

909 P.2d at 815–816.

Based on the evidence before it, the court did not err in refusing to order a competency examination as facts "sufficient to raise a doubt" in the court's mind concerning the defendant's competency were not presented. *See Fox v. State,* 524 P.2d 60, 65 (Okl.Cr. 1974) ("It is not sufficient for the defense counsel merely to say that he is unable to communicate with his client; and, that his client's mental processes seem to waver while he is discussing the case with him; and, that his client does not understand the seriousness of a charge, to constitute justification for a finding that the defendant is mentally incompetent. In considering this question it is necessary that we consider the entire record."). *See also Middaugh v. State,* 767 P.2d 432, 434–35 (Okl.Cr.1988) (mere fact appellant had been treated for a mental condition in the past, had a heart condition, and had a nervous condition was not enough to raise a sufficient doubt as to his mental capacity to stand trial—especially in light of his testimony to the contrary); *Siah v. State,* 837 P.2d 485, 487 (Okl.Cr.1992) (lack of memory from substance abuse, trauma or a disease, does not create, per se, a lack of competence to stand trial).

The statements and testimony presented here concerning Appellant's inability to consistently pay attention, the possibility that he might be unable to focus attention at trial, the possibility that he might exhibit inappropriate behavior, his inclusion in a special education program at school and low I.Q. are not sufficient to raise a doubt as to Appellant's competency to stand trial. They are general, speculative assertions which do not raise a doubt as to Appellant's ability to consult with counsel or understand the nature of the proceedings against him.

Appellant further challenges the court's reliance on its own observations of his conduct asserting that in so doing the court improperly discounted the opinions of experienced defense counsel. In *Bryson,* we found no error in the trial court's reliance upon its own observations of the defendant in determining that no doubt as to competency had been raised.

Under 22 O.S.1981, § 1175.3(B), the determination as to whether a sufficient doubt has been raised as to the defendant's com-

petency is left to the trial judge. This determination is made based upon the particular facts and circumstance of each case. The trial court is not bound to give precedence to the opinions of expert witnesses nor is it bound to consider opinions of witnesses which are not relevant to its decision. Therefore, we find no error in the trial court's determination, based upon its own personal observation and inquiry of Appellant, that no doubt as to competency had been raised.

876 P.2d at 249–250.

Therefore, we find no error in the present case in the trial court's reliance upon its own observations. Here, we find the record clearly supports the trial court's finding, therefore such finding will not now be disturbed.

■ Appellant next argues the evidence during trial and sentencing proceeding was sufficient to raise a doubt as to his competency. As Appellant notes, a competency issue may surface at any time during the trial proceedings. The court may initiate a competency determination at any time, without an application, if the court has a doubt as to the competency of the accused. 22 O.S.1991, § 1175.2(A). The "trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 181, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975).

Most of Appellant's proposition deals with evidence presented at formal sentencing. However, he does briefly refer to certain evidence and conduct during trial which he asserts warranted an inquiry into his competency, i.e. that he spent the entire trial drawing a picture and the second stage testimony of three mental health professionals. A school psychologist from a local public school, a licensed clinical psychologist, and a professor in the Department of Psychiatry at the local university provided mitigation testimony on Appellant's behalf. None of the witnesses had evaluated Appellant on the basis of his competency to stand trial. Their collective testimony was that Appellant was diagnosed as having an attention deficit disorder, post-traumatic stress disorder, and borderline personality disorder. None of this testimony, or Appellant's drawing of a picture during trial, is sufficient to raise a doubt as to Appellant's ability to consult with counsel or understand the nature of the proceedings against him. At most, it showed Appellant had difficulty paying attention during trial and suffered from emotional problems.

At the formal sentencing, defense counsel informed the court he had a doubt as to Appellant's competency to be sentenced. Counsel was permitted to take the stand and testified that he had talked to Appellant about sentencing proceedings and a motion for a new trial. However, Appellant did not seem to fully understand "what a motion for new trial was". Counsel concluded that Appellant was not competent because he was not able to adequately assist counsel in the sentencing procedure. On cross-examination, counsel admitted he was able to communicate with Appellant on "some things", that Appellant did do "some things to assist me", but that he did not believe Appellant adequately assisted him. On re-direct, counsel stated that he believed Appellant was aware of certain facts that counsel was not and he believed there were some facts that Appellant was unable to relate to counsel.

After counsel's testimony, the trial court examined Appellant. In response to the court's questions, Appellant gave his full name, stated he did not have any aliases and that his family nickname was "Gene." Appellant stated he no longer remembered his social security number, but he did know he was 24 years old and his birthday was October 29. He guessed that his birth year was 1970. He stated he attended school into the tenth grade. He stated that since he had been in jail, the only medicine a doctor had prescribed for him was something for irritated skin. When asked if he was taking any other medications on an ongoing basis, Appellant initially did not understand the question. When explained the meaning of ongoing, he said he was taking medicine for irritated skin every evening after dinner. When asked if he knew of what crime he had been convicted, he said "of killing somebody" and that such a crime was

called murder. He indicated he was aware a jury had sentenced him and that they "want[ed] to kill me." Appellant stated he had talked to counsel and tried to "give them what they want to know."

Based upon the above, the trial court found there was no doubt as to Appellant's competency to be sentenced. The court based this finding on its reading of the recorded statement made by Appellant to a detective in New Mexico and his personal observations of Appellant during the preliminary hearing, arraignment, pre-trial motion hearings, and trial. The court made note of Appellant's conversations with counsel, responses to law enforcement officials who accompanied him to and from the courtroom, his responses to other court officials, and his responses in the instant hearing.

Based on the evidence before it, the court did not err in finding there was no doubt as to Appellant's competency to be sentenced. The evidence was sufficient to show that Appellant knew the nature of the crime with which he was charged, the range of punishment and that he was capable of assisting his attorney with his defense. *Cargle*, 909 P.2d at 816. Because Appellant may have chosen not to fully cooperate and assist counsel is not grounds for finding him mentally incompetent.

Appellant next contends that Oklahoma's statutory definition of competency is unconstitutional in that it requires only that the defendant understand the nature of the charges against him. According to Appellant, the Fourteenth Amendment requires that the defendant have "a rational as well as factual understanding of the proceedings against him" citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Appellant recognizes we addressed and rejected the very same argument in *Lambert v. State*, 888 P.2d 494, 498 (Okl.Cr. 1994), but asks this Court to reconsider the issue. We decline to do so.

In *Lambert*, we stated that the test enunciated in *Dusky* was "whether he [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of

the proceedings against him." *Id.* This Court found these same principles were part of Oklahoma law. The Court continued to say that the interpretation of 22 O.S.1981, § 1175.1(1), "parrots the Supreme Court's standards" and "[i]n our view, there is little or no difference between the effective meaning of the statute and the terms used by the Supreme Court. In both cases, the accused is required to understand the charges against him, the implications of the charges against him and be able to effectively assist his attorney in defense of the charges against him." *Id.* In conclusion, the Court found no merit to the argument that the Oklahoma statutes fall short of a constitutionally acceptable means of measurement when competency to stand trial is at issue. *Id.* This position was reaffirmed in *Valdez v. State*, 900 P.2d 363, 369 (Okl.Cr.1995), *cert. denied*, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995). Appellant presents no compelling reason to disregard our precedent.

Finally, Appellant asserts the trial court's failure to order a competency evaluation was a structural error not subject to a harmless error analysis. However, as we find no error occurred in the trial court's decision not to order a competency evaluation, we need not address the applicability of a harmless error analysis. Accordingly, this assignment of error is denied.

## JURY SELECTION

In his first assignment of error, Appellant contends he was forced to use three of his nine peremptory challenges to excuse venirepersons whose ability to consider all three punishment options was substantially impaired by their views in favor of the death penalty, their unwillingness to consider the punishment option of life without the possibility of parole, and their refusal to seriously consider mitigating evidence before making a sentencing determination. Appellant further claims that because he was forced to use peremptory challenges to remove these three objectionable venirepersons, he was unable to remove three other objectionable jurors who he identified at the conclusion of voir dire.

■■■ The decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion whose decision will not be disturbed unless an abuse of discretion is shown. *Salazar v. State*, 919 P.2d 1120, 1127 (Okl.Cr.1996). To determine if the trial court properly ruled on a challenge for cause, this Court will review the entirety of the juror's voir dire examination. *Carter v. State*, 879 P.2d 1234, 1244 (Okl.Cr. 1994), *cert. denied*, 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995). The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would prevent, or substantially impair, the performance of his duties as a juror in accordance with his instructions and his oath." *Carter*, 879 P.2d at 1243–44 quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985). A venireperson is only required to be willing to consider all the penalties provided by law and not be irrevocably committed to one punishment option before the trial has begun. *Id.*

In the present case, Appellant challenged for cause venirepersons Austin, Ward and Walker. When the trial court refused to excuse these potential jurors for cause, Appellant used his first, second and fifth peremptory challenges, respectively, to remove them from the panel. Turning to Ms. Austin first, she initially stated she could consider all three punishments—death, life, life without parole, before deciding which punishment she believed to be appropriate and would not automatically impose the death penalty. In response to questioning by defense counsel, she stated she would consider all three punishments equally, and would listen to both sides. However, when asked if she favored the death penalty for a person convicted of first degree premeditated murder, she replied yes. At that point, defense counsel challenged for cause. The prosecutor, after asking for an opportunity to question the potential juror, exposed the fact that she did not understand the legal meaning of the term premeditated. She believed the term to mean the murder was "preplanned", "plotted out or thought out". When the correct legal definition was explained, she indicated that

the appropriate sentence would depend on the evidence, and not knowing what the evidence was in the case before her, she would be able to consider all three possible punishments. After further extensive questioning by both sides, much of which resulted in Ms. Austin's views of punishment in specific fact situations, the trial court overruled subsequent challenges for cause finding the potential juror had repeatedly stated she could follow the law and instructions as given to her by the court. We find no abuse of discretion in the trial court's refusal to excuse the potential juror for cause as she did repeatedly state she could set aside any personal beliefs and would impartially judge the case on the evidence presented at trial and follow the law as instructed by the court. This is all that can be asked of a juror. *Hale v. State*, 750 P.2d 130, 139 (Okl.Cr.), *cert. denied*, 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164 (1988).

Appellant contends that venireperson Ward believed death was the only appropriate punishment for premeditated murder, that the defendant's personal history was irrelevant to the sentencing decision, and that she would only possibly consider a sentence of life without parole for intentional murder. These conclusions can be reached only by taking selected responses by Ms. Ward out of context. Looking at her voir dire examination in its entirety, she stated that if instructed by the court she could consider all three possible punishments, that she could consider a non-death penalty option even if the murder was found to be intentional, and that she would follow the law as instructed by the court. As with prospective juror Austin, defense counsel asked Ms. Ward what punishment she felt would be appropriate in certain specific situations. Unhappy with her responses, Appellant challenged her for cause. In an attempt to discern Ms. Ward's ability to perform her duties as a juror, the trial court questioned her further and elicited the following: that she would listen to and consider all evidence presented, including evidence of the defendant's life; that she had not made up her mind as to the appropriate punishment in a case of premeditated murder; that her judg-

ment as to the appropriate punishment would be based on the evidence and law as presented at trial; that she would follow the law to the best of her ability, that she would consider all the evidence the court told her to consider; that she would give that evidence "fair, serious consideration"; and that she would give both sides a fair trial under the law and the evidence of the case. A juror's personal beliefs are not grounds for removal for cause if that juror states he or she can set aside those personal beliefs and judge the case before them on the law and evidence as presented. Ms. Ward stated she could do just that and the trial court's refusal to excuse her for cause was not error.

Appellant's final challenge is to Ms. Walker whom he contends did not believe she could vote for life without parole in a premeditated murder case. Ms. Walker stated she could disregard anything she had previously heard about the defendant and the case and base her judgment on the evidence and law presented in court. She stated she would be "obedient to the law" even if she did not agree with the particular principle of law. She stated she would consider all three possible punishments if so instructed by the court and would not automatically impose the death sentence. In response to questioning by defense counsel, Ms. Walker stated she thought it was important to consider both mitigating and aggravating evidence, and that "things about who [the defendant] is and what his life has been like" were important to consider. When asked if life without parole was a sentence she would impose in a case of premeditated murder, Ms. Walker stated she would have to hear the facts first and be instructed as to the law before she could make such a decision. Ms. Walker repeatedly stated she would consider all the evidence presented at trial and could consider all possible punishment options. The trial court did not err in refusing to excuse her for cause.

During the voir dire of each of these challenged venirepersons, specific hypothetical situations were set forth and each venireperson was asked their opinion of the appropriate punishment. This was before they had been given any instructions on the law applicable to the hypothetical or the law in this case. Any answers given in such a situation must be viewed in light of the entire voir dire examination. When the voir dire examinations are viewed in their entirety, it is clear that none of the potential jurors held views regarding punishment that would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath as jurors. Therefore, we find no abuse of discretion in the trial court's refusal to excuse prospective jurors Austin, Ward and Walker for cause.

Appellant finally complains the trial court erred in refusing to grant his request for additional peremptory challenges when he used three of his nine challenges to remove Austin, Ward and Walker. Appellant made a record after voir dire closed, requesting additional peremptories and naming three jurors he would challenge if granted additional peremptories. Appellant has thus preserved the issue for appeal. *Cannon v. State*, 904 P.2d 89, 98 (Okl.Cr.1995), *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996).

Appellant's argument here must fail because the trial court did not err in refusing to remove these prospective jurors for cause. Oklahoma law clearly provides that a defendant is entitled to nine peremptory challenges in a capital trial. 22 O.S.1991, § 655. As we find no error in the trial court's ruling, and as Appellant has failed to show prejudice, this assignment of error is denied.

## FIRST STAGE TRIAL ISSUES

■ Appellant contends in his sixth proposition of error that his confession was inadmissible as it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Initially, he asserts that he never waived his *Miranda* rights as neither an express waiver nor a written waiver of those rights was obtained. He also argues that any statements made were not given knowingly, voluntarily and intelligently, but only after his will was overborne by certain assurances and promises.

As a result of an interview with Agent Becker of the Santa Fe, New Mexico Police Department on September 6, 1996, Appellant admitted to his participation in the kidnap-

ping and murder of the victim. During a hearing on Appellant's motion to suppress these statements, excerpts from the preliminary hearing transcript and transcribed statements of Appellant to Agent Becker were relied upon to determine the voluntariness of the confession. Agent Becker testified he initially asked Appellant questions regarding his place of birth, his marital status, his education and place of employment. Agent Becker then told Appellant he had the right to remain silent, that anything he said could be used against him in court, that he had the right to talk to an attorney before the police asked him any questions and to have the attorney present during questioning. Becker told Appellant that if he could not afford an attorney, one would be appointed for him before any questioning. If Appellant decided to answer questions now, without a lawyer present, Appellant would still have the right to stop answering at any time. Appellant was also told he had the right to stop answering at anytime until he talked to a lawyer. When asked if he understood these rights, Appellant responded "yes". When asked if he was willing to give a statement, Appellant responded "it depends on what you want?" When told there was speculation that he might have killed some people, Appellant asked about his friend and if he was still alive. With his questions answered, Appellant said to Agent Becker "what do you want to know?" When Becker said "are you willing to talk", Appellant responded "I'll say something, but I ain't going to say everything." Becker again asked if Appellant understood his rights, to which he responded "I understand what they are, I've been arrested before." Becker then proceeded to ask Appellant various questions concerning incidents in Ohio, Missouri and Oklahoma. Appellant answered some questions by saying "next question" and others by giving substantive responses. After about an hour Agent Becker turned off the tape recorder and continued to question Appellant for another one to two hours. Becker testified that it was during this time that Appellant confessed to killing Ruddell. Becker then turned the tape recorder back on for another five to ten minutes of questioning. Becker again read Appellant the *Miranda*

warning. The State also produced a written waiver of rights signed by Agent Becker with the notation "subject unable to sign". Becker explained that Appellant had his hands cuffed behind his back.

 Waiver of *Miranda* rights may be manifested by other than an express statement to that effect. *Jeffries v. State,* 679 P.2d 846, 849 (Okl.Cr.1984); *Williams v. State,* 572 P.2d 238, 240 (Okl.Cr.1977). An express statement of waiver, oral or written, is not essential. *Id.* When a defendant has been fully advised of his constitutional rights and it appears he has understood those rights, it can be assumed that any incriminating statements he makes thereafter constitute a waiver. *Rosteck v. State,* 749 P.2d 556, 558 (Okl.Cr.1988). The law does not require that an explicit statement of waiver is necessary to support the finding of a waiver. *Id.* A valid waiver can be found from the surrounding circumstances. *Phillips v. State,* 481 P.2d 776, 778 (Okl.Cr.1971).

The circumstances in the present case establish a knowing and voluntary waiver of Appellant's *Miranda* rights. Appellant unequivocally indicated his understanding of his rights and exhibited no reluctance to talk with Agent Becker. Appellant never stated he did not want to talk with the police or that he wanted counsel present. Appellant's responses to Agent Becker's questioning indicates a strategic choosing of what he was going to talk about, not the invocation of his right to remain silent. Appellant relies on *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) for the proposition that the state must show the defendant had a full awareness of the rights being waived and of the consequences of waiving those rights. He asserts that whatever knowledge he may have had about the consequences of making incriminating statements was obviated by Agent Becker's affirmative reassurances that any statements made by Appellant would remain private.

The record reflects that Appellant was twice advised that anything he said could be used against him in court. Each time Appellant indicated he understood. Appellant expressed concern that the tapes of his statements would be made public. Agent Becker

assured Appellant that he would retain custody of the tapes and that they would not be played in public. The record shows that Appellant's concern was not that the tapes would be used in court against him, but that they would be given to the press and played on television. Appellant indicated his belief that his mother would be disappointed. Therefore, Agent Becker's assurances regarding the privacy of the tapes did not obviate Appellant's understanding of the consequences of his incriminating statements.

Further, relying on *United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988) and *United States v. Pena,* 897 F.2d 1075, 1081–82 (11th Cir.1990) Appellant asserts he invoked his right to remain silent by sitting quietly and looking at the floor instead of answering questions. Both cases are distinguishable from the present case. In *Pena,* the defendant said he wanted to cooperate with the police, but that he couldn't because "they will kill my parents." Acknowledging the statement to be ambiguous, the court found the statement to constitute an invocation of the defendant's right to remain silent. The court stated that law enforcement officials should have sought to clarify the defendant's uncertainty instead of pressing forward and eliciting additional ambiguous invocations of the right to remain silent. In the present case, Appellant's responses were not ambiguous and Agent Becker made clear Appellant's intentions by repeatedly asking Appellant if he understood his rights.

In *Wallace,* the defendant maintained her silence for approximately ten minutes in the face of repeated questioning. The Court concluded that the questioning after the defendant's initial refusal to respond violated *Miranda.* In the present case, Appellant did not remain silent in the face of repeated questioning, nor did he repeatedly refuse to answer questions. Rather the record shows he paused before giving certain answers and other answers were given slowly and somewhat reluctantly. Any brief silences on Appellant's part did not indicate he no longer wanted to cooperate.

Therefore, despite the absence of an express waiver of his *Miranda* rights and the absence of his signature on the written waiv-

er form, the record firmly establishes that Appellant knowingly and voluntarily waived his rights.

■■■■ The ultimate test of the voluntariness of a confession is whether it is the product of an essentially free and unconstrained choice by its maker. *Crawford v. State,* 840 P.2d 627, 635 (Okl.Cr.1992) citing *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). To determine whether the maker's will was overborne, the court must look to the totality of the surrounding circumstances, both the characteristics of the accused and the details of the interrogation. *Id.* The dispositive inquiry is whether police misconduct contributed to the confession. *Fontenot v. State,* 881 P.2d 69, 76 (Okl.Cr.1994) citing *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). When the admissibility of a statement or confession is challenged, the burden is on the State to show, by a preponderance of the evidence, that it was voluntary. This Court will not disturb the trial court's ruling permitting the introduction of a confession if it is supported by sufficient evidence that appellant knowingly and intelligently waived his rights and understood the consequences of his waiver. *Rosteck,* 749 P.2d at 558.

■■■■ Appellant argues the State has not met its burden here as Agent Becker "confused and diluted" the *Miranda* warnings by indicating that his statements would not be used against him for any purpose, that he knew Appellant was depressed because he could no longer see his son, that Becker became increasingly frustrated with Appellant and said "the truth shall make set [sic] you free", had cigarettes brought to him after initially refusing, told Appellant the tape would not be made public, unsuccessfully baited Appellant by referring to "this woman you killed", telling Appellant he needed to be thanked because they shared a hatred of child molesters and called Appellant a coward for not confessing.

■■■■ Reviewing the record, we find none of these allegedly coercive factors sufficient to establish that Appellant's will was so overborne that his statements were not free and

voluntary. Agent Becker's statements concerning the use of taped statements has been previously discussed, *supra*, and we find nothing coercive about those statements. Although Becker initially refused Appellant's request for a cigarette, this does not in itself indicate coercion. Appellant was eventually given a cigarette and a sandwich and offered the use of restroom facilities. There is no evidence any other requests were denied, or that any promises or threats were made by Becker. Comments by Becker concerning the truth setting Appellant free and a reference to Appellant being a coward were not such as to have overborne Appellant's will. Mere advice or exhortations by the police that it would be better for the accused to tell the truth, unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary. *Castro v. State*, 745 P.2d 394, 403 (Okl.Cr.1987), *cert. denied*, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988). While Appellant may have been in a depressed state, there is no indication that he was under any undue stress or that his emotional condition was so fragile that Becker's statements could have overtaken his will. Accordingly, we find the State has met its burden of showing that Appellant's statements were voluntary and that he knowingly and intelligently waived his rights and understood the consequences.

■ Finally, Appellant asserts that statements given to Becker prior to the giving of the *Miranda* warning were inadmissible because they were "incriminating and testimonial" and "explicitly and implicitly, related to factual assertion or disclosed information."

Prior to giving Appellant the *Miranda* warning, Becker asked Appellant where he was born, his marital status, his employment and his education. Appellant responded that he was born in Oklahoma, moved to Ohio, was married to Susan who was divorcing him and had been kicked out of school in the eleventh grade for "beating the hell out of the principal." The reference to the principal was redacted. *Miranda* warnings were not required prior to these initial questions as they were merely investigatory and not accusatory. *Moore v. State*, 761 P.2d 866, 876 (Okl.Cr.1988). The purpose of the questions was merely to obtain background information and not to elicit incriminating responses.

Appellant's reliance on *Pennsylvania v. Muniz*, 496 U.S. 582, 583, 110 S.Ct. 2638, 2641, 110 L.Ed.2d 528 (1990) is misplaced. In *Muniz*, the defendant was arrested for driving under the influence of alcohol. Without being advised of his rights under *Miranda*, he was taken to a booking center where, as was the routine practice, he was told that his actions and voice would be videotaped. He then answered seven questions regarding his name, address, height, weight, eye color, date of birth, and current age, stumbling over two responses. He was also asked, and was unable to give, the date of his sixth birthday. The Court found Muniz's failure to respond to the sixth birthday question was incriminating not just because of his slurred delivery, but also because the content of his answer supported an inference that his mental state was confused. His response was testimonial because he was required to communicate an express or implied assertion of fact or belief and, "thus, was confronted with the 'trilemma' of truth, falsity, or silence, the historical abuse against which the privilege against self-incrimination was aimed." In the present case, Appellant's responses about his birth, marital status, etc., did not "explicitly or implicitly, relate a factual assertion or disclose information." Accordingly, we find no error in admitting Appellant's responses to background information as no *Miranda* warnings were required. This assignment of error is denied.

■ In his seventh assignment of error, Appellant asserts the trial court erred in refusing requested instructions on aiding and abetting. He further argues the omission of such instructions combined with the giving of an instruction on causation relieved the State of the burden of proving beyond a reasonable doubt Appellant's intent to kill.

■ Appellant was charged as "acting in concert and together" with Eric Elliott. He was not charged as an aider and abettor, but with firing the fatal shots at the victim.

(O.R.1).[3] No evidence of aiding and abetting was presented by the State; the evidence showing that Appellant shot and killed the victim. No evidence was presented by Appellant, through witnesses or cross-examination, that co-defendant Elliott shot the victim, although that theme was relied upon in Appellant's closing argument. As such, there was no reason for the court to give instructions on aiding and abetting. *Bryson*, 876 P.2d at 255 (instructions on a defense are to be given only when there is sufficient evidence on record to support that defense.)

■ Further, the instructions on causation did not have the effect of diminishing the State's burden of demonstrating beyond a reasonable doubt Appellant's intent to kill the victim. Instruction No. 8, the uniform instruction on causation, Oklahoma Uniform Jury Instructions–Criminal (1st ed. OUJI–CR 426) was given without objection.[4] Relying in part on *Sadler v. State*, 846 P.2d 377, 387 (Okl.Cr.1993), Appellant now argues the instruction should not be given where the cause of death is not disputed as the instruction is superfluous and potentially confusing. In *Sadler*, this Court said that it would have been better if OUJI–CR 426 had not been given "as it deals with the issue of whether a defendant's actions caused a death and appellant did not dispute the victim's cause of death, but rather claimed he did not commit the murder at all." 843 P.2d at 387. The Court did not find this reversible error however, stating "in light of the fact that appellant did not object to this instruction and under the facts and circumstances of this case and the instructions that were given, we do not find that this error confused the jury in believing appellant was guilty of first-degree murder solely because he had been drinking." *Id.*

In the present case, in addition to Instruction No. 8, the jury was also instructed as to the elements of first degree malice afore-

thought murder and that the State must prove each element beyond a reasonable doubt (No. 9); and the definition of malice aforethought as the deliberate intention to take away the life of a human being (No. 10). These two instructions clearly stated that in order for the defendant to be found guilty it must be established beyond a reasonable doubt that he personally intended to kill the victim.

Appellant asserts Instructions No. 9 and 10 did not clear up any confusion relying in part on a note sent from the jury during deliberations asking "[c]an a person be found guilty of murder one if they didn't pull the trigger?" (O.R.286). This note in itself does not support Appellant's assertion as we do not know during what point in the deliberations the note was sent. At best we can only surmise that after the judge's response that the jury had "all the instructions of law appropriate in the case", the jury further reviewed the instructions and arrived at a verdict. In our review of the instructions, and considering Appellant's failure to object to No. 8, we find the instructions, when considered in their totality, fairly and accurately stated the applicable law. *Id.* at 387 (jury instructions are not to be considered in isolation but as a unit, and after such consideration, if the totality of the instructions fairly and accurately state the applicable law, they are sufficient.) Any confusion which may have been caused by Instruction No. 8 was harmless as it did not have a substantial influence on the outcome of the trial. *Simpson v. State*, 876 P.2d 690, 702 (Okl.Cr. 1994). Accordingly, this assignment of error is denied.

■ Appellant challenges the sufficiency of the evidence supporting the conviction for first degree malice aforethought murder in his ninth assignment of error. He reiterates his argument that at most he was an aider

---

3. "Aiding and abetting in a crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or encourages the commission of the crime." *Hindman v. State*, 647 P.2d 456, 458 (Okl.Cr.1982) as quoted in *Conover v. State*, 933 P.2d 904, 910–11 (Okl.Cr. 1997).

4. OUJI–CR 426 states:

No person may be convicted of murder in the first degree unless his conduct caused the death of the person allegedly killed. A death is caused by conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life. (O.R. 296)

and abettor in the death of the victim and that in the absence of his confession to Agent Becker, the evidence was insufficient to demonstrate beyond a reasonable doubt that he shot the victim or that he intended for her to die.

As discussed previously, *supra,* Appellant was charged and prosecuted as the perpetrator of the murder of Roxanne Ruddell, not as an aider and abettor to the murder. The evidence presented at trial supports the jury's finding that Appellant killed the victim with malice aforethought. A portion of that evidence validly considered by the jury was Appellant's statement as testified to by Agent Becker. In that statement, Appellant said he and co-defendant Elliott drove to an area near a lake in Oklahoma. They saw the victim fishing alone. Intending to steal her vehicle, Appellant and Elliott approached the victim and engaged her in conversation for approximately fifteen (15) minutes. She told Appellant that if he just stole her pickup and didn't hurt her, she would not call the police. Appellant said this made him mad because he thought the victim was lying to him. Appellant and Elliott tied the victim's hands, made her walk a short distance then had her sit in a "v" at the base of a tree. Appellant said he instructed the victim to lean her head back and he shot her in the head three times. The jury was appropriately instructed that this statement should be "carefully scrutinized and received with great caution" and that if the statement was found to be given freely and voluntarily it could be considered with all the other facts and circumstances in evidence. (O.R.309–310, Instruction No. 21).

In addition to the confession, the evidence also showed that the victim had intended to go fishing near Point 6 at Lake Stanely Draper on September 3, 1994, that a car stolen by Appellant and Elliott was found near Point 6 and that the victim's body was found near the location on September 4, 1994. The body was in the base of a "v" in a tree and had three gunshot wounds to the head. Appellant points out that no fingerprints were found on the murder weapon, that the murder weapon belonged to Elliott's father, and that Elliott's fingerprints were found on the other weapons confiscated by the authorities. However, when the evidence is reviewed in the light most favorable to the State, *Spuehler v. State,* 709 P.2d 202, 203–204 (Okl.Cr.1985), sufficient evidence was presented to support a finding that Appellant killed the victim with malice aforethought. This assignment of error is denied.

## SECOND STAGE TRIAL ISSUES

In his third proposition of error, Appellant contends the giving of an *Allen*[5] instruction during sentencing deliberations in this case was "per se coercive" and misled the jury.

This Court has, in the past, found no error in the giving of *Allen* instructions after the jury has announced itself to be deadlocked after several hours of deliberation. *McCarty v. State,* 904 P.2d 110, 125 (Okl.Cr.1995); *Givens v. State,* 705 P.2d 1139, 1142–43 (Okl. Cr.1985); *Sartin v. State,* 637 P.2d 897, 898 (Okl.Cr.1981). This Court has also found that, "it is not improper for a trial judge, after a jury has been deliberating for some time, to call them into court to ascertain whether there is a reasonable probability of reaching a verdict so long as the judge exercises great caution to say nothing to coerce an agreement or to indicate his feelings in the case." *McCarty,* 904 P.2d at 125 quoting *Shultz v. State,* 811 P.2d 1322, 1330–31 (Okl. Cr.1991). Therefore, we find the giving of the *Allen* instruction is not "per se" coercive.

Appellant argues further that the particular conditions under which the jury returned the death sentence in his case established the verdict was the result of judicial interference with the jury's duty to decide punishment independent and free from coercive influences. The record reflects the jury had deliberated for approximately six (6) hours when the court inquired as to their progress.

THE COURT: . . . have you reached a— has the jury reached a verdict on any of the charges?

THE FOREPERSON: Yes, we have.

---

5. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

THE COURT: Are you making progress on the one or more that you have not reached a verdict on?

THE FOREPERSON: I don't think so.

THE COURT: Do you think you will be able to reach a verdict on the one or more charges that you have not reached a verdict on?

THE FOREPERSON: No, sir, I don't.

THE COURT: Do not disclose the numerical division—excuse me—do not disclose which way you are leaning. Just tell me, if you would, please, on the—is there one charge or more than one charge that you have not reached—

THE FOREPERSON: Yes, sir. One charge.

THE COURT: Without disclosing which way the vote is leaning, tell me what the numerical division is.

THE FOREPERSON: Half and half.

The court then asked both attorneys if they had any questions they wanted the court to ask before the jury was sent back to deliberate further. Both answered in the negative.

THE COURT: I would like you for you to go back and try a little longer. We won't leave you in there this long without inquiring further. But at this time I would ask you to go back and try again on the remaining charge.... (Tr. 1693–1694).

Defense counsel objected to the jury resuming deliberations, asked that the jury be declared deadlocked and that a mistrial be declared. The trial judge denied the motion stating he would let the jury deliberate "at least another hour." The judge informed attorneys that he would review the *Allen* instruction and determine if it was appropriate. Defense counsel objected to giving the *Allen* instruction, noting the late hour (it was after 10:00 p.m.), and an earlier poll of the jury which indicated the jury would rather return the next morning than deliberate late at night. The court denied the motion, stating that it had told the jury that if they finished the evidence by noon that he was planning to instruct them and send them out that afternoon, but that if they did not finish the evidence until after lunch, they would wait until the next day. The court noted it

asked for a show of hands and eight indicated they would rather wait until the next day rather than get the case late in the afternoon. The court also noted that all parties thought they would get the case to the jury sooner than they did, but no one objected to sending the jury out to deliberate (at 4:00 p.m.) until that moment.

Approximately one hour later at 11:05 p.m., the judge called the foreperson back into court and inquired further. The foreperson indicated the numerical division had changed, but "there is a least one person on each side that has no intention of changing their mind and reaching a compromise." After informing counsel that it was going to give the *Allen* instruction without any sort of time frame attached, the court gave the jury the *Allen* instruction, OUJI–CR 910 (1st ed.) The court advised counsel that if progress was not made by midnight, "we'll think more seriously about doing something with it." (Tr. 1699). At 12:36 a.m. the jury returned with a verdict.

Specifically, Appellant complains the trial court ignored the foreperson's statement that at least one person on each side had no intention of compromising, ignored the wishes of eight jury members not to deliberate late at night, and refused to share his personal deadlines with the jury. Appellant contends jurors could infer from the court's comments that they would be forced to deliberate all night if necessary

■ The length of time a jury deliberates is within the discretion of the trial judge. *McCarty*, 904 P.2d at 123 (jury deliberated seven and a half hours before receiving *Allen* charge); *Ellis v. State*, 795 P.2d 107, 109 (Okl.Cr.1990) (jury deliberated eight hours and forty minutes before receiving *Allen* charge). The six hours in this case was not in itself extraordinary. Further, it is not necessary for the trial court to inform the jury of any time frame it may have in mind for deliberations. Indeed, such information could hamper the jury's ability to freely deliberate as long as necessary. Here, the court admitted that the case had been given to the jury later than expected but that no one had complained until late that night. The court did not ignore the jurors wishes

not to deliberate late at night but considered them and determined it was best to begin deliberations and continue them for a period of time. The court did not infer it would make the jury deliberate all night but indicated it would periodically check on its progress. Under the facts and circumstances of the case, we are unable to conclude that the verdict was the result of judicial interference or that the *Allen* instruction had a coercive effect.

Appellant further argues that regardless of the particular circumstances under which the instruction was given in this case, the instruction was "per se coercive" and actively misled the jury because it was given in a death penalty case. Appellant contends that because the instruction says in part "[i]f at all possible, you should resolve any differences and come to a common conclusion that this case may be completed[,]" the jury was misled as to the law of 21 O.S.1991, § 701.11. He also argues that giving the *Allen* instruction fails to recognize the jury's right to fulfill its obligations by returning a final, nonunanimous decision.

Title 21 O.S.1991, § 701.11 provides in part that "[i]f the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life without parole or imprisonment for life." This Court has never required a jury instruction on this point of law as such an instruction could improperly distract the jury from performing its duty of assessing the sentence. *See Malone v. State,* 876 P.2d 707, 713 (Okl.Cr.1994) (such an instruction is improper because it invites the jury to avoid its difficult duty to pass sentence on the life of an accused). *See also Boltz v. State,* 806 P.2d 1117,1124–25 (Okl. Cr.), *cert.denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991); *Fox v. State,* 779 P.2d 562, 574 (Okl.Cr.1989), *cert.denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). Appellant acknowledges this point and argues that the absence of such an instruction makes the giving of the *Allen* charge the more coercive and misleading.

In *Lowenfield v. Phelps,* 484 U.S. 231, 237, 108 S.Ct. 546, 551, 98 L.Ed.2d 568 (1988) the Supreme Court upheld the giving of an *Allen* instruction in a Louisiana capital case where state law provided that if the jury "hangs," the court shall impose a sentence of life imprisonment. The Court found the combination of the polling of the jury and the supplemental instruction was not "coercive" in such a way as to deny petitioner any constitutional right. 484 U.S. at 239, 108 S.Ct. at 552. The Court noted "[t]he State has in a capital sentencing proceeding a strong interest in having the jury 'express the conscience of the community on the ultimate question of life or death.'" 484 U.S. at 238, 108 S.Ct. at 551.

Here, giving the *Allen* instruction combined with omitting any reference to the consequences of the jury's failure to reach a unanimous verdict did not coerce the jury into reaching a verdict. We reiterate our position that informing the jury as to the consequences of their failure to reach a unanimous verdict could improperly distract the jury from performing its duty of assessing the sentence. Appellant has failed to show how directing the jury to deliberate further and make an "earnest and diligent effort" to arrive at a verdict denied him the constitutional right to be sentenced by a jury that was not misled as to its sentencing duties or coerced by judicial instructions.

■ Appellant asserts in his fourth proposition of error that victim impact evidence from the families of the Ohio and Missouri victims was improperly admitted. During the second stage of trial, the State presented the testimony of Tom Loader, Steve Brewer and Gene Brewer. Mr. Loader, the son of Ruth Loader, the victim in the Ohio case, testified to the circumstances surrounding the disappearance of his mother. The other two witnesses, grandson and son of the victims in Missouri, testified to the circumstances surrounding the murder of the elderly couple. In pre-trial motions and arguments at trial, the State presented this evidence as victim impact evidence and, over defense objections, it was admitted.

To call this evidence victim impact evidence was error in at least two respects. The testimony in question addressed the proof and discovery of the other homicides, and not the impact of the crimes on the

victims' family members. Under 21 O.S.Supp.1992, § 701.10(C) and 22 O.S.Supp. 1993, § 984, the type of evidence contemplated by these statutes is restricted to the impact of the homicide on the victim's family members. Further, the type of evidence contemplated by these statutes is restricted to the impact on the family members of the victim of the homicide on trial. Evidence of the impact of another homicide on other family members, even a homicide committed by the defendant on trial, is not admissible as victim impact evidence under these statutes. Therefore, to mischaracterize and label this evidence and admit it as victim impact evidence was error. However, it is a trial error which is subject to a harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 307, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991).

Conducting such an analysis, we find any error harmless as the evidence constituted evidence of Appellant's prior unadjudicated crimes and was relevant to proving the alleged aggravating circumstance of "continuing threat". *Hain v. State*, 919 P.2d 1130, 1141 (Okl.Cr.1996); *Paxton v. State*, 867 P.2d 1309, 1321–22 (Okl.Cr.1993), *cert. denied*, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994). Accordingly, this assignment of error is denied.

In his fifth proposition of error Appellant challenges the admission of evidence of the Ohio and Missouri crimes to support the aggravator of "continuing threat" and asks this Court to reconsider its decision condoning the admission of unadjudicated offenses as proof of "continuing threat". In *Paxton*, we discussed the admission of unadjudicated offenses to support the "continuing threat" aggravator. 867 P.2d at 1321–23. We found evidence of a defendant's criminal history relevant to the jury's determination as to whether the defendant is likely to commit future acts of violence that would constitute a continuing threat to society. *Id.* Appellant has not persuaded us to reconsider that position.

Appellant also claims the State failed to present evidence to establish the trustworthiness of his confession to the murder of Ruth Loader. Implicit in the holding that unadjudicated acts can be used to prove the defendant is a continuing threat to society, is the principle that the State must prove beyond a reasonable doubt a defendant is a continuing threat to society. *Roberts v. State*, 868 P.2d 712, 719–20 (Okl.Cr.), *cert. denied*, 513 U.S. 855, 115 S.Ct. 158, 130 L.Ed.2d 96 (1994). However, it need not completely try its case on the other crimes the defendant may have committed which serve as a basis for that finding. *Id.* It is the evidence of future dangerousness, not the crime itself, that is relevant for the jury's consideration. *Id.* Therefore, although the State was not trying Appellant on the Loader homicide, the long standing principle that a conviction for a particular crime cannot be had upon a defendant's extrajudicial confession alone is still applicable. *Id.* The State bore the responsibility of proving in some way the corpus delicti, independent of Appellant's confession. *Id.*

Here, Appellant gave a confession to police in which he admitted to kicking in Mrs. Loader's door and finding Mrs. Loader at home, tying her hands and placing her in the trunk of her car. Appellant said he and Elliott decided to kill her as they drove away in her car. They stopped on a road outside of town, took her out of the trunk and Appellant shot her three times in the head. Appellant admits that other law enforcement officers presented by the State testified to finding a door at Mrs. Loader's home which, in the officer's opinion, had been kicked open; to finding a phone wire pulled from the phone jack; that Mrs. Loader's car keys were missing; and the discovery of her car in Missouri. However, Mrs. Loader herself was never located and it is this which Appellant asserts renders the confession uncorroborated and inadmissible.

Clearly, the failure to locate a body makes it impossible to corroborate whether Mrs. Loader was shot three times in the head as Appellant claimed. However, it does not make corroboration of her death impossible. Tom Loader testified that at the time of trial his mother had been missing for over one year. He testified to having numerous relatives, none of which had heard from Mrs. Loader in the year that she had been missing. This led him to conclude that she was

dead. This testimony was sufficient to corroborate Appellant's confession to killing Mrs. Loader. A confession need not be corroborated as to each material element of the charged offense. *Fontenot v. State,* 881 P.2d 69, 79 (Okl.Cr.1994). Unless inconsistencies between the confession and the other evidence so overwhelm the similarities that the confession is rendered untrustworthy, it remains within the province of the jury to determine whether the confession is credible. *Id.* After reviewing Appellant's confession and the other evidence, we find the confession sufficiently corroborated as to render it trustworthy and therefore admissible.

Appellant further contends admission of the unadjudicated acts from Ohio and Missouri violated his rights under Eighth and Fourteenth Amendments because such evidence was untrustworthy and denied him the right to a reliable sentencing decision. This argument has previously been rejected in *Paxton,* 867 P.2d at 1321–23 and *Robedeaux v. State,* 866 P.2d 417, 434 (Okl.Cr.1993), *cert. denied,* 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994).

For the foregoing reasons, we find evidence of the unadjudicated offenses committed in Ohio and Missouri properly admitted to prove the aggravating circumstance of "continuing threat". Accordingly this assignment of error is denied.

Appellant asserts in his eighth assignment of error the death sentence imposed is improper because the trial court failed to instruct the jury to make findings in accordance with *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Appellant's argument is based upon his seventh proposition of error wherein he argued that under the first stage instructions the jury could have found him guilty without finding that he had the specific intent to kill. As discussed, *supra,* we found the first stage instructions required a finding of the specific intent to kill if a guilty verdict was to be returned. Further, this case is distinguishable from *Enmund* and *Tison* in that it is not a case where the defendant had no knowledge that a person would be killed, had no direct participation in the victim's death and had no intent to kill. Here the evidence showed that Appellant fired the fatal shots with the specific intent to kill the victim. Therefore, we find no error in the court's refusal to instruct the jury to make findings in accordance with *Enmund* and *Tison.* This assignment of error is denied.

In his eleventh assignment of error, Appellant complains that error resulted from the display of prejudicial photographs by the prosecution during second stage closing argument. During closing argument, the prosecution displayed certain photographs on a six by four foot screen. Photographs to which Appellant objected at trial and now on appeal were two photos of the victim in the present case and two photos of the victims of the Missouri homicides. The photographs had previously been admitted into evidence over defense objections. Appellant complains the only purpose for displaying the photographs was to illustrate the prosecutor's argument "that four people cried out from their graves for justice." (Appellant's brief, pg. 95). To the contrary, we find the photos relevant in proving the aggravating circumstance of "continuing threat".

Evidence of the callousness of a murder is a relevant consideration in evaluating whether there is a probability that the defendant will commit acts of violence which will constitute a continuing threat to society. *Hain,* 919 P.2d at 1147. Photographs showing the victim's body slumped at the base of a tree and of the three bullet wounds to her forehead as well as photos of the elderly Brewer couple's lifeless bodies in the basement of their home are relevant in showing the callous nature of the crimes.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Smith v. State,* 737 P.2d 1206, 1210 (Okl.Cr.), *cert denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987); 12 O.S.1991, § 2403. When the probative value of photographs is outweighed by their prejudicial impact on the jury—that is the evidence tends to elicit an emotional rather than rational judgment by the jury—then they should not

be admitted into evidence. *President v. State*, 602 P.2d 222, 225 (Okl.Cr.1979); *Oxendine v. State*, 335 P.2d 940, 942 (Okl.Cr.1958). The probative value of the photographs in the present case was not outweighed by any prejudicial impact.

Appellant further complains that allowing the State to reintroduce the photos which had been previously admitted and use them a second time in closing argument so infected the sentencing proceedings with unfairness as to undermine the reliability of the entire the death sentence. This Court has held there is a point in the display of relevant photographs where the photographs are so duplicative that a needless repetition can inflame the jury and result in error. *President*, 602 P.2d. at 226. The burden is on the Appellant to prove that he was injured by the error. *Barr v. State*, 763 P.2d 1184, 1187 (Okl.Cr.1988); *Harrall v. State*, 674 P.2d 581, 583 (Okl.Cr.1984). Such a repetition of photos sufficient to warrant error is not present in this case. The photos had only been identified and admitted into evidence prior to their use during closing argument. We do not find this so inflamed the jury as to call into question the reliability of the death sentence. Therefore, we find the photographs were properly admitted into evidence.

■■■ Appellant further complains about a newspaper photograph displayed to the jury during closing argument which showed him in handcuffs. Appellant complains the photo was inadmissible for the same reasons the State may not bring a defendant in front of the jury in chains and shackles. *See Davis v. State*, 709 P.2d 207, 210 (Okl.Cr.1985) (seeing a defendant in chains leads jurors to conclude that he is a "dangerous criminal who had to be chained and shackled to prevent his escape or prohibit him from doing harm to others and or any act of violence.") The trial court overruled Appellant's objection finding the purpose of the photo was to show Appellant's appearance at the time he was apprehended and that the jury would certainly expect someone who has been accused of murder to be handcuffed.

This case is distinguishable from *Davis* in that Appellant was not tried in handcuffs and shackles but only seen restrained by such in a newspaper photograph. The photograph was used to corroborate the testimony of an Oklahoma City Police Officer who testified to seeing Appellant driving a car in Oklahoma City the day before the murder. Further, the jury had heard testimony concerning Appellant's crime spree in Ohio and Missouri, his apprehension in New Mexico and his return to Oklahoma on murder charges. Any error in admitting the photograph was harmless as we find it did not have a substantial influence on the outcome of the sentencing proceedings. *Simpson*, 876 P.2d at 702. Accordingly, this assignment of error is denied.

In his twelfth assignment of error, Appellant asserts his death sentence cannot stand as the evidence in mitigation outweighed the evidence in aggravation. Specific standards for balancing aggravating and mitigating circumstances are not required, *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) and it is not this Court's duty to substitute its judgment for that of the jury. This Court is only statutorily mandated to perform a sentence review which requires determining whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor and whether the evidence supports the jury's finding of a statutory aggravating circumstance. 21 O.S.1991, § 701.13(C).

In *Fisher v. State*, 736 P.2d 1003, 1011 (Okl.Cr.1987) this Court rejected a claim similar to the one in the present case stating:

> (it) will review such evidence only to the extent necessary to determine whether there was sufficient evidence from which a rational sentencer could find that the balance of aggravating and mitigating circumstances warranted a death sentence. We believe that this standard, which is analogous to the sufficiency of the evidence standard adopted by this Court in *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr. 1985), comports with the requirements of due process and adequately ensures that the death penalty is evenly enforced.

*Id.*

Applying this standard to the instant case, we find that there was sufficient evidence

from which a rational sentencer could find that the aggravating circumstances outweighed the mitigating circumstances. Thus, this assignment of error is without merit.

Appellant challenges the constitutionality of the "continuing threat" aggravator in his fourteenth assignment of error. He recognizes this Court has previously rejected such a challenge. *Allen v. State*, 923 P.2d 613, 622 (Okl.Cr.1996); *Cargle*, 909 P.2d at 832; *Mitchell v. State*, 884 P.2d 1186, 1208 (Okl. Cr.1994), *cert. denied* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Snow v. State*, 876 P.2d 291, 298 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). We do so again.

## PROSECUTORIAL MISCONDUCT

■ In his tenth assignment of error, Appellant asserts that prosecutorial misconduct during first and second stages denied him a fair trial. Initially, he contends that during first stage closing argument, the prosecutor stated that reasonable doubt could only be found where the defense had come forward with evidence to support another theory of facts. He argues that under the facts of this case, the reference to the "defendant's non-existent burden to disprove the State's case" was an improper comment on the defendant's failure to testify and produce evidence to disprove the State's theory. Appellant's objection to this comment has preserved the matter for appellate review.

■ Before a purported comment at trial on a defendant's failure to testify will constitute reversible error, the comment must directly and unequivocally call attention to that fact. *Hansford v. State*, 764 P.2d 910, 912 (Okl.Cr.1988); *Mahorney v. State*, 664 P.2d 1042, 1046 (Okl.Cr.1983). Comments which refer to a defendant's failure to present evidence which refutes the State's case do not constitute comment on the defendant's failure to testify. *Berry v. State*, 753 P.2d 926, 930 (Okl.Cr.1988).

Reading the comment in context, the prosecutor did not call attention to the fact that Appellant did not testify. Rather, he addressed the jury instruction on circumstantial evidence, telling the jury that it should

not be considered inferior to direct evidence and that it can have the same weight as direct evidence. He stated that argument by counsel was not evidence and if the jury found a theory in the case, it must be supported by evidence. We find nothing improper in counsel's comment as it was a correct statement of the law. *See Rogers v. State*, 890 P.2d 959, 969 (Okl.Cr.1995) (arguments are not evidence).

This case is clearly distinguishable from *Lime v. State*, 479 P.2d 608 (Okl.Cr.1971) relied upon by Appellant. In *Lime*, the prosecution stated "[t]here is no excuse and they offer you no excuse whatsoever for the manner in which this was done." 479 P.2d at 608. This Court found this to be a comment upon the failure of the defendant to testify. Here, the prosecutor did not comment on Appellant's failure to testify or failure to present evidence. His comments did not misled the jury into believing Appellant had the burden of producing evidence of his innocence. We cannot say that the prosecutor's comment constituted error.

■ Also during first stage closing argument, Appellant contends the prosecutor undermined the presumption of innocence. This comment we review only for plain error as no contemporaneous objection was raised at trial.

The prosecutor stated:

· You had to presume he was innocent. But in the real world, now you know he wasn't sitting there as an innocent man. He sat there enjoying the presumption that we would all enjoy, anybody would enjoy, but he's not an innocent man. The evidence shows he's not an innocent man. (Tr. 1109).

Appellant compares this comment to *Cobbs v. State*, 629 P.2d 368, 369 (Okl.Cr.1981) wherein the prosecutor argued the "cloak" of innocence had been removed.

The comment in the present case is distinguishable from that in *Cobbs* as it does not say the presumption of innocence does not apply, as in *Cobbs*, but only that the evidence shows the defendant is guilty. Reading the comment in context, it is not a personal opinion of guilt, but rather a statement on

the evidence. Further, *Cobbs* was reversed because of an accumulation of prosecutorial misconduct. We do not have such an accumulation of error in this case. The comment here was an isolated remark which did not have a substantial influence on the outcome of first stage.

██ Appellant further asserts that during first stage closing argument, the prosecutor improperly demonstrated the shooting of the victim by picking up the handgun. When defense counsel objected to the pointing of the weapon, the prosecutor apologized and continued his argument. Later, to conclude his closing, the prosecutor again picked up the gun, pointed it and pulled the trigger four times as he talked about the victim's death. Appellant's objections were overruled.

This Court has previously upheld demonstrations which were based on the evidence presented at trial and not theatrical demonstrations. *Brown v. State*, 777 P.2d 1355, 1358 (Okl.Cr.1989) (prosecutor used a police officer during closing argument to illustrate the position of the decedent seated in a chair when shot in the neck and back by appellant.) *See also Woodruff v. State*, 846 P.2d 1124, 1136 (Okl.Cr.), *cert. denied.*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993) (police officer demonstrated use of the garrotte on the neck of an Assistant District Attorney).

Here, the demonstration was an effort to illustrate the effort and intent required to fire the gun in an attempt to show the killing was premeditated. The brief demonstration was not so prejudicial as to outweigh the probative value of helping the jury understand the State's theory of the commission of the offense. Therefore, we find no error in the demonstration.

██ Finally, Appellant asserts that during second stage closing argument, the prosecution denigrated the defense and attacked the credibility of defense counsel. Appellant complains of comments referring to "phony guilt trips or what-if syndrome", that defense attorneys wanted the jury to "speculate this case into another universe", and "contrive a defense when there isn't one". Not all of these comments were met with a contemporaneous objection.

This Court has recognized that in the heat of argument, counsel do occasionally make remarks which are not justified by the testimony, or which may be prejudicial to the accused. *Roberts*, 868 P.2d at 718. However, it is improper to overturn a conviction on the basis of prosecutor's comments standing alone, "for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.* Taken in context, we find the prosecutor's statement a comment on the evidence and inferences therefrom, and his belief that the evidence did not support Appellant's claims of mitigating circumstances. We do not find the comments an attack on defense counsel's veracity or attempt to denigrate the defense. These comments did not prejudice Appellant's rights to a fair sentencing proceeding.

██ Appellant also claims the prosecution attacked defense counsel's credibility by stating, in regard to defense counsel's comments that the child endangerment charges did not involve violence: "I submit to you that if either one of them [defense attorneys] had ever bothered to look in the indictment in that case they wouldn't suggest that to you." Appellant's objection was overruled. He now argues the comment conveyed the impression that evidence not presented to the jury, but known to the prosecutor, supported the "continuing threat" aggravator and thereby jeopardized his right to be tried solely on the basis of the evidence presented to the jury.

The judgment and sentence for the offense of Child Endangerment was admitted into evidence. Therefore, it could properly be relied upon to support the "continuing threat" aggravator. Any impropriety in the prosecution's reference to defense counsel does not warrant reversal or modification as it was not so prejudicial as to have denied Appellant a fair sentencing proceeding or to have influenced the death sentence.

Based upon the foregoing, we find Appellant was not denied a fair trial because of

prosecutorial misconduct. Therefore, this assignment of error is denied.

## CUMULATIVE ERROR

In his thirteenth assignment of error, Appellant contends the aggregate impact of the errors in this case warrants reversal of his convictions and at the very least modification of his death sentence. This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Ashinsky v. State*, 780 P.2d 201, 209 (Okl.Cr.1989); *Weeks v. State*, 745 P.2d 1194, 1196 (Okl.Cr.1987). However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial. *Bechtel v. State*, 738 P.2d 559, 561 (Okl.Cr. 1987). While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

## *MANDATORY SENTENCE REVIEW*

Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, the jury found the existence of two (2) aggravating circumstances: 1) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. 21 O.S.1991, § 701.12(7), (5).

■ We find the aggravator of "continuing threat" supported by sufficient evidence: the unadjudicated offenses from Ohio and Missouri and prior convictions for child endangering, theft and breaking and entering from Ohio, and prior convictions for unauthorized use of a motor vehicle and embezzlement by bailee from Oklahoma.

■ The focus of the aggravating circumstance that the murder was committed to avoid lawful arrest or prosecution is the state of mind of the murderer; it is he who must have the purpose of avoiding or preventing lawful arrest or prosecution. *Carter,* 879 P.2d at 1250. This aggravator also requires a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution. *Id.*

■ Here, Appellant admitted to killing one woman in Ohio and stealing her car, driving it to Missouri where an elderly couple was killed for their car, driving that car to Oklahoma where Mrs. Ruddell was killed and her pickup taken by Appellant and his co-defendant to New Mexico. This is ample evidence to support the jury's finding the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution. *Id; Fox,* 779 P.2d at 576; *Rojem v. State,* 753 P.2d 359, 369 (Okl.Cr.1988).

■ Turning to the mitigating evidence, Appellant presented ten (10) witnesses, including his mother, sister, brother, his former houseparents and sister at Cookson Hills Christian School, and mental health professionals. These witnesses testified that Appellant is young, that he has suffered from brain damage which has impaired his ability to function as a normal human being; that he suffers from mental disorders including Attention Deficit Disorder, and Post–Traumatic Stress Disorder; he has endured physical, sexual and psychological abuse; had endured neglect and abandonment during his childhood; has adjusted to stable environments such as jail and boarding school and is likely to continue to adjust in a prison environment; he had school and learning difficulties; he has been placed in the role of scapegoat by his family; despite extreme difficulties within his family and social environment he has developed some meaningful relationships with family and acquaintances; he had been a peace loving person throughout his life; he has artistic abilities of merit; at the time of

the homicide, he was under great stress and discomfort due to the disintegration of his marriage and the separation between himself and his young son; and at the time of the homicide he was in a situation where he was essentially homeless and without any meaningful support group. This evidence was summarized into sixteen (16) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating.

Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate as to Count I, first degree murder. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the judgment and sentences for First Degree Murder, Kidnapping and Robbery with Firearms are **AFFIRMED.**

LANE and JOHNSON, JJ., concur.

CHAPEL, P.J., and STRUBHAR, V.P.J., concur in result.

