**Willard Keith CUDJO, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–91–130.

Court of Criminal Appeals of Oklahoma.

Sept. 9, 1996.

Rehearing Denied Oct. 25, 1996.

---

14. *Roper v. Mercy Health Center,* see note 9, supra.

Rob L. Pyron and Jack Mattingly, Seminole, for Appellant at Trial.

William N. Peterson, District Attorney, and Paul Smith, Assistant District Attorney, Seminole, for the State at Trial.

Carol A. Walker, Assistant Appellate Defender, Norman, for Appellant on Appeal.

Susan Brimer Loving, Attorney General of Oklahoma, A. Diane Blalock, Assistant Attorney General, Oklahoma City, for Appellee on Appeal.

## *OPINION*

JOHNSON, Presiding Judge:

Willard Keith Cudjo was tried by a jury and convicted of Conspiracy to Commit Robbery by Force or Fear (Count I), Robbery with a Dangerous Weapon (Count II) and First Degree Malice Aforethought Murder (Count III) in the District Court of Seminole County, Case No. CRF–90–94. The jury found the existence of the following three aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel; (2) the murder was committed for the purpose of avoiding lawful arrest or prosecution; and (3) Appellant posed a continuing threat to society. In accordance with the jury's recommendation, the Honorable Gary R. Brown sentenced Appellant to ten (10) years imprisonment for the conspiracy conviction, seventy-five (75) years for the robbery conviction, and death for the murder conviction. From this judgment and sentence, Appellant has now perfected his appeal to this Court.

During the evening hours of May 8, 1990, Appellant fatally shot Paul Pierce, the manager of the Wewoka Food Center grocery store. Appellant had entered the grocery store near closing hours and hidden so that he could burglarize the store after the store closed. However, Appellant was surprised by Pierce when he returned to the store to lock the cash register drawers and daily receipts in the store safe. Upon being confronted by Pierce, Appellant shot Pierce once in the back of the head. Pierce died a few days later from the gun shot wound.

Other relevant facts will be discussed in the assignment of error to which they relate.

## PRETRIAL/JURY SELECTION ISSUES

Appellant contends in his eighth proposition of error that the Information was insufficient as it failed to allege the elements of the offense of First Degree Murder and failed to inform Appellant of the theory of homicide upon which the State would rely. Citing *Pickens v. State,* 885 P.2d 678, 683 (Okl.Cr. 1994), Appellant contends the Information in the present case was clearly insufficient. The Court in *Pickens* applied *Miller v. State,* 827 P.2d 875, 877–879 (Okl.Cr.1992), which requires a criminal Information to set forth facts to allege each element of the crime charged. The Court concluded the Information did not properly allege each element of first degree murder under the theories of malice or felony murder. *Pickens,* 885 P.2d at 683–684.

■ However, this Court recently rejected *Miller* in *Parker v. State,* 917 P.2d 980 (Okl. Cr.1996). The Court concluded that any failure to allege facts constituting an offense raises due process questions, but does not automatically affect the trial court's jurisdiction. *Id.* at 985. Thus, our review now focuses on whether the Information gave the defendant notice of the charges against him and apprised him of what he must defend against at trial. *Id.* at 986. This determination will be made on a case-by-case basis.

In the instant case, Appellant never objected to the Information at the trial level. Furthermore, although a specific reference was

made at the top of the Information to 21 O.S. § 701.7(B) which is the felony murder subsection of the First Degree Murder statute, the jury was only instructed on malice aforethought murder. Defense counsel did not object to these instructions. Moreover, felony murder instructions were apparently never considered by any of the parties. Consequently, we will limit our review to whether the Information gave Appellant sufficient notice that he was to defend against the charge of malice murder.

■ Upon looking to the "four corners" of the Information together with all of the materials that were made available to Appellant at preliminary hearing and through discovery, we find Appellant received sufficient notice of the charge against him in the present case. *See Parker,* 917 P.2d at 986. It is also clear from the trial record that Appellant understood he was charged with malice aforethought murder.[1] Consequently, we find no due process violation occurred. This assignment of error is thus denied.

Appellant complains in his third proposition of error that two prospective jurors were improperly excused for cause *sua sponte* by the trial court when they expressed reservations about the death penalty. In *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968), the United States Supreme Court held:

> ... a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause SIMPLY BECAUSE THEY VOICED GENERAL OBJECTIONS TO THE DEATH PENALTY or expressed conscientious or religious scruples against its infliction. [footnote omitted] [emphasis added]

The Court in *Witherspoon* further noted that "[t]he most that can be demanded of a venireman in this regard is that he is willing to consider all of the penalties provided by state law, ..." *Witherspoon,* 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21.

The trial court in the instant case initiated the voir dire. The court limited its voir dire on the issue of the death penalty to the following question:

> In a case where the law and the evidence warrant, could you without doing violence to your conscience recommend the death penalty?

After posing this question, the trial court polled the prospective jury panel for their responses. Venire-persons Redding, Warrior and Sawyer were not required to answer the question as the trial court stated it had already determined they would be excused for cause. Venire-persons Conley and Sands were the only two prospective jurors to express reservations about the death penalty. Thereafter, the trial court excused venire-persons Redding, Warrior, Sawyer, Conley and Sands. As the trial court had already determined that Redding, Warrior and Sawyer needed to be excused for other reasons, we must assume Conley and Sands were excused strictly because they expressed reservations about the death penalty.

■ This Court has repeatedly held the "violence done to your conscience" question is improper as it tends to be confusing. *McGregor v. State,* 885 P.2d 1366, 1375 (Okl. Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Hooks v. State,* 862 P.2d 1273, 1277 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994). Moreover, violence done to one's conscience is not the point of the *Witherspoon* decision. *Mayes v. State,* 887 P.2d 1288, 1297 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995); *Duvall v. State,* 825 P.2d 621, 630 (Okl.Cr.1991), *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). Rather, the only legitimate concern is whether each jury member is willing to consider the imposition of the death sentence, as one of the alternatives provided by state law, should the case be appropriate for that punishment. *Mayes,* 887 P.2d at 1297.

■ Although we have found this error to be harmless on numerous occasions in the

---

1. During his closing argument at the end of the guilt/innocence stage of trial, defense counsel acknowledged that he and Appellant understood the charges they were there to defend against.

Moreover, no objection was ever made to the Information or to the jury instructions instructing on malice aforethought murder.

past where the record clearly demonstrated that the correct standard was substantially satisfied [2], we are unable to do so in this case. The trial court limited its questioning regarding the death penalty to the one improper question. Thereafter, the two venire-persons who expressed reservations about the death penalty were immediately excused. Without further inquiry into their views regarding the death penalty, we cannot conclude Conley and Sand's views would have prevented or substantially impaired the performance of their duties as jurors.

Finding plain error has occurred, Appellant's sentence of death cannot be permitted to stand. *Witherspoon*, 391 U.S. at 522–23, 88 S.Ct. at 1776–78. We are thus left with two options—either remand this case for re-sentencing or modify Appellant's death sentence. For reasons which will be discussed more fully when addressing the sentencing stage issues, we find Appellant's death sentence should be modified.

## ISSUE RELATING TO GUILT-INNOCENCE

Appellant contends in his first assignment of error that the evidence was insufficient to support his convictions for First Degree Murder and Robbery with a Dangerous Weapon. Appellant contends the evidence established nothing more than a suspicion that he was in the Wewoka Food Center the night Paul Pierce was shot and the armed robbery was committed. Appellant specifically contends the State's key witness, Maurice Brown, was not credible, and thus, no rational trier of fact could have accepted his testimony as true.[3] Appellant further asserts that Brown's accomplice testimony was not sufficiently corroborated.

■ The State's proof at trial consisted of both direct and circumstantial evidence. Consequently, due process requires this Court determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See also Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr.1985).

■ Prior to the murder, Appellant told several people that he had been burglarizing the Wewoka Food Center by hiding in the store near closing hours and taking things after everyone was gone. Appellant said that Maurice Brown, an employee at the grocery store, had been giving him "inside help." Appellant told Patrick Conway Jones that Brown had advised him where some keys were kept. When he was ready to leave the store, Appellant would exit the store through the back door.

Brown testified he had been feeding Appellant information about the Wewoka Food Center's operations for a couple of months prior to the murder. He further stated that he had given Appellant a .22 caliber revolver which belonged to his mother. At trial, Brown identified State's Exhibit 27 as that revolver. A few days before the murder occurred, Appellant spoke with Brown again about the store's operations, and who would be closing the store the following day. The two discussed robbing Sheila Qualls, the employee in charge of closing the store that day, and discussed how they would split the proceeds between them. This plan was never carried out.

In the early evening hours of May 8, 1990, just prior to the murder, Appellant was at Gayla James' house. Ms. James' house was located approximately one block from the Wewoka Food Center. Appellant left James' house around 7 p.m. that evening. Appellant told James he needed to go to Atoka. Shortly thereafter, Appellant was observed entering the Wewoka Food Center by Nancy Smith and her seventeen year old nephew, Justin Sipes. Ms. Smith and Mr. Sipes were waiting outside the grocery store in their car

---

**2.** *Mayes*, 887 P.2d at 1297; *McGregor*, 885 P.2d at 1375; *Harjo v. State*, 882 P.2d 1067, 1074 (Okl.Cr.1994), *cert. denied*, — U.S. —, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995).

**3.** In exchange for his truthful testimony at Appellant's trial, Johnny Maurice Brown pled guilty to one count of conspiracy to commit robbery and received a sentence of ten (10) years imprisonment.

while Smith's husband was in the store shopping. Mr. Sipes testified that he and his aunt were outside the store for about fifteen to twenty minutes but never saw the defendant leave the store.

Appellant returned to Gayla James' house later that evening. While James was unsure of the exact time Appellant returned, she was sure that it was dark outside. When James expressed surprise at seeing Appellant again that night, he told her he had decided not to go to Atoka. He did not indicate where he had been. About ten minutes after Appellant returned to her house, James heard sirens going toward the Wewoka Food Center. Thereafter, Appellant said he needed to go home to call his friends in Atoka and tell them he was not coming after all.

James and her baby cousin accompanied Appellant to his house. When they got there, he told her she needed to get out of his truck because he needed to get something from behind the seat. She got out and put the baby on the ground. The baby fell and got dirty, so James picked her up, dusted her off, and they got back in the truck. James then saw Appellant going around the back corner of his house and noticed he had something red in his hands. It appeared the item was made of cloth. After a few minutes, Appellant returned to his truck, and they went back to James' house. Appellant stayed there for a few minutes, then left to go home.

The next day, Brown saw Appellant in downtown Wewoka. Appellant got in Brown's car and said, "I guess, you know what happened?" When Brown replied affirmatively, Appellant stated:

It just kind of happened.... He surprised me.... Well, I'm not even going to tell you. I don't want you to know.

Appellant then asked Brown how Mr. Pierce was doing.

When the police arrived at the Wewoka Food Center, Paul Pierce was still coherent. When asked what had happened, Pierce said he had been near the produce counter when he came across someone wearing a black ski mask who stuck a gun in his face and took him back to one of the store's freezers. Pierce said he asked the man not to shoot him, then, in Pierce's words to several witnesses, "The lights went out." Pierce could not say whether the man had shot him or had simply hit him in the head. When asked what type of gun his assailant had, Pierce responded, "A .38." Pierce further indicated that his assailant was black.[4]

The investigation of the scene uncovered two sets of footprints on the freshly mopped floors of the Wewoka Food Center. One set belonged to the victim, Paul Pierce. The other set was identified as coming from a pair of Fila athletic shoes. Additionally, Ronald Jones, a firearms and tool examiner with the OSBI, examined the two bullet fragments removed from Paul Pierce by the medical examiner. Jones determined that the weapon used was probably a .22 caliber firearm.

On May 17, 1990, OSBI Agent K.P. Larsh and District Attorney Investigator Wes Edens interviewed Maurice Brown at the Seminole County Sheriff's Office. As a result of that interview, Investigator Edens obtained a search warrant for the house where Appellant lived. Before the warrant was executed, Brown agreed to telephone Appellant in an attempt to gain incriminating information. At trial, Brown identified State's Exhibit 28 as the cassette recording of his telephone conversation with Appellant. During that recorded conversation, Brown told Appellant he needed the gun back so he could return it to his mother, who had not yet been questioned by police. Appellant admonished Brown that they would have to "hang tough," and that the gun was "the key" because the police could test fire it to see if it "matched."

After the phone conversation between Brown and Appellant, Investigator Edens and other officers went to Appellant's house to execute the warrant. After they stopped and turned off the car lights, Appellant came out of his house and walked toward the car.

---

4. There were some inconsistencies in the testimony regarding Paul Pierce's statements. He apparently told Officer Wood there was only one robber, but told Officer Hudson that there was more than one.

As he approached, Appellant was advised he was under arrest and should fall to the ground and freeze. Appellant hesitated momentarily, then complied. A towel-wrapped .22 caliber pistol was removed from Appellant's right front pocket. A pair of Fila tennis shoes and a red ski mask were also recovered from Appellant's bedroom.

Based on an examination of size and wear characteristics, OSBI Agent Jerry Peters testified the prints taken from the Wewoka Food Center could have come from Appellant's Fila shoes. Although Peters could not positively say that Appellant's shoes made the prints, he testified that "the possibility of another shoe making that impression ... [was] very remote." Due to the extremely fragmented condition of the bullet pieces taken from Pierce, Appellant's gun could neither be identified nor eliminated as the gun which killed Paul Pierce.

After a thorough examination of the evidence offered, we easily conclude that "any rational trier of fact could have found the essential elements of the crime[s] charged beyond a reasonable doubt." *Spuehler*, 709 P.2d at 203–04. While there was some conflict in the testimony, there was competent evidence to support the jury's findings. *See Woodruff v. State*, 846 P.2d 1124, 1134–35 (Okl.Cr.), *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). Furthermore, although Mr. Brown was an admitted liar and petty thief, his testimony was sufficiently corroborated by other witnesses and by the physical evidence. Consequently, this proposition of error fails.

### SENTENCING STAGE ISSUES

■ Appellant contends in his fourth proposition of error that the evidence was insufficient to prove two of the three aggravating circumstances the jury relied upon to support the sentence of death. Appellant first contends the evidence was insufficient to prove that the homicide was "especially heinous, atrocious, or cruel." The aggravating circumstance of "especially heinous, atrocious, or cruel" is only applicable to those cases in

which the murder was preceded by torture or serious physical abuse. *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

■ The victim in the present case suffered a single gun shot wound to his head. Upon coming into contact with Appellant in the store, Paul Pierce saw Appellant had a gun and asked him not to shoot. Thereafter, Appellant shot Pierce in the back of his head. While Pierce was aware he had been injured, he was not sure what type of wound he had received (i.e. gun shot wound or blow to the head). Moreover, the gravity of Pierce's injury was not apparent to others at the scene. Captain Hudson testified Pierce was coherent and making sense. Upon being questioned by Officer Wood regarding his condition, Pierce said he was all right. However, other witnesses did testify that Pierce experienced nausea, vomiting and shortness of breath and complained about his head hurting. After arriving at the Wewoka Hospital, Pierce became unresponsive and was flown to Baptist Hospital in Oklahoma City where he later died.

■ While Pierce did experience some conscious physical or mental suffering prior to his death, the evidence fails to demonstrate that his murder was preceded by torture or serious physical abuse. Pierce's murder clearly did not involve torture.[5] Nor does the evidence demonstrate that his death was preceded by "serious physical abuse." While all murders are accomplished by some kind of physical abuse, only murders which involve serious physical abuse fall under the "especially heinous, atrocious, or cruel" aggravating circumstance. After all, the Eighth Amendment requires that the aggravator, "especially heinous, atrocious, or cruel," be applied only to that class of murders which is most egregious. *See Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). While Pierce's murder was senseless and tragic, the manner of Pierce's killing did not involve any acts of

---

5. Torture in the context of the heinous, atrocious or cruel aggravating circumstance includes the infliction of great physical anguish or extreme

mental cruelty. *Hawkins v. State*, 891 P.2d 586, 597 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

injury or cruelty beyond the scope of the act of killing itself. *See Hawkins,* 891 P.2d at 596–597. *See also Booker v. State,* 851 P.2d 544, 548 (Okl.Cr.1993); *Battenfield v. State,* 816 P.2d 555 (Okl.Cr.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992). Consequently, this aggravating circumstance must fail.

■ Appellant further contends the evidence was insufficient to support the continuing threat to society aggravating circumstance. In order to support this aggravating circumstance, the State must demonstrate a defendant will continue to present a threat to society after sentencing. *Malone v. State,* 876 P.2d 707, 717 (Okl.Cr.1994). A defendant's criminal history, the callousness of the crime, threats against others, lack of remorse, and attempts to prevent calls to the police are all factors this Court has previously considered when addressing this issue. *Medlock v. State,* 887 P.2d 1333, 1349 (Okl. Cr.1994), *cert. denied.* —— U.S. ——, 116 S.Ct. 310, 133 L.Ed.2d 213 (1995).

■ Once again, the evidence in the instant case does not support the finding of this aggravating circumstance. While this was a senseless murder, it was not committed in a particularly brutal or calloused manner. *See Malone,* 876 P.2d at 718. Moreover, Appellant's criminal history does not support the finding of this aggravating circumstance. Although Appellant had admittedly burglarized the grocery store on prior occasions, these unadjudicated burglaries appear to have amounted to nothing more than petty thefts.[6] Furthermore, Appellant's statement that if he ever "got caught in the Wewoka Food Center, it would be them or him", is not sufficient to demonstrate he would pose a continuing threat to society. Consequently, this aggravating circumstance also fails.

Having found two of the three aggravating circumstances invalid, this Court typically would be placed in the position of independently reweighing the remaining valid aggravating circumstance with the mitigating cir-

cumstances. *See Robedeaux v. State,* 866 P.2d 417, 436 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994); *Hayes v. State,* 845 P.2d 890, 893 (Okl.Cr.1992). However, in light of our previous determination that the jury was improperly "death qualified," this option is not available in this case. Rather, our only options are to remand the case for resentencing or modify Appellant's death sentence. Under the circumstances of this case, we find it would be futile to remand this case for resentencing as the evidence offered in mitigation appears to outweigh the remaining aggravating circumstance of "murder to avoid lawful arrest or prosecution." Therefore, Appellant's death sentence is hereby modified to life without the possibility of parole.

The remainder of Appellant's propositions of error need not be addressed as they are rendered moot by the modification of Appellant's death sentence.

### CONCLUSION

Counts I and II are **AFFIRMED.** Appellant's conviction for Malice Aforethought Murder (Count III) is **AFFIRMED,** but his sentence of death is modified to life without parole.

LUMPKIN and STRUBHAR, JJ., concur.

CHAPEL, V.P.J., dissents.

LANE, J., joins in CHAPEL's dissent.

CHAPEL, Vice Presiding Judge, dissenting:

I respectfully dissent to the decision to affirm the conviction in this case as I find the Information here defective. The Information and problems resulting therefrom in this case are not comparable to the issues discussed in *Parker.*[1] Rather, the Information and resulting problems in this case are more comparable to the issues in *Pickens.*[2] The *Cudjo* Information charges felony murder (the Information is poorly worded, but there is a specific reference to the felony murder

---

6. The only evidence regarding these alleged burglaries came from Appellant's statements.

1. 917 P.2d 980 (Okl.Cr.1996).

2. 885 P.2d 678 (Okl.Cr.1994).

statute on the face of the document and a reference to an underlying crime on the charging language, all of which would make the Information sufficient under *Parker* to charge felony murder) and he was convicted of malice aforethought murder. The jury was not even instructed on felony murder. The result is that we have before us in this case a person who was convicted and sentenced to die for a crime for which he was never charged. We should not allow such a result as it is a clear violation of the due process clauses of the Oklahoma and United States Constitutions.

I am authorized to state that Judge Lane joins in this dissent.