**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 3 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEWIS EUGENE GILBERT,

    Petitioner - Appellant,

v.

    No. 01-6085

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

    Respondent - Appellee.

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(No. CIV-99-74-T)**

---

Gloyd L. McCoy, of Coyle, McCoy & Burton, Oklahoma City, Oklahoma, for
Petitioner-Appellant.

Nancy Elizabeth Connally, Assistant Attorney General (Jennifer B. Miller,
Assistant Attorney General, and W.A. Drew Edmondson, Attorney General of
Oklahoma, on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **BRISCOE** , **LUCERO** , and **MURPHY** , Circuit Judges.

---

**LUCERO**, Circuit Judge.

Lewis Eugene Gilbert, an Oklahoma state prisoner sentenced to death, appeals the district court's denial of his petition for a writ of habeas corpus. This court has granted Gilbert a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c) with respect to three of his claims of legal error: (1) that his right to a fair trial was violated by a coerced verdict at the sentencing stage of the trial; (2) that he was improperly denied his request for a competency evaluation in state court; and (3) that there was insufficient factual support for the jury's finding of the existence of the "avoid arrest" and "continuing threat" aggravating circumstances. We have independently reviewed the record and conclude that Gilbert is not entitled to habeas relief on any of these claims. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm.

## I

Gilbert and a co-defendant were convicted of the 1994 murder of Roxanne Ruddell, a security guard at Lake Stanley Draper in Oklahoma. [1] Prior to this murder, Gilbert and his co-defendant had killed an elderly woman in Ohio, stolen her car, and driven it to Missouri. In Missouri they had killed an elderly couple, stolen their car, and driven it to Oklahoma. The two took the second stolen car to

---

[1] The facts are taken from the opinion of the Oklahoma Court of Criminal Appeals affirming Gilbert's convictions and sentence. See Gilbert v. State, 951 P.2d 98, 103 (Okla. Crim. App. 1997). Gilbert was also convicted of kidnapping and robbery with a firearm.

Lake Stanley Draper, where they saw Ruddell fishing alone. Intending to steal her pickup, they tied Ruddell's hands and made her walk a short distance to sit in the "vee" at the base of a tree. Gilbert then shot her three times in the head. Approximately three days later, Gilbert and his co-defendant were apprehended in New Mexico sleeping in a ditch. Ruddell's pickup was found nearly a mile away.

During the sentencing stage of the trial the prosecutor argued, and the jury found the existence of, two aggravating circumstances: that there was a probability that Gilbert would commit criminal acts of violence such that he constituted a "continuing threat to society," and that the murder was committed for the purpose of "avoiding or preventing a lawful arrest or prosecution." Gilbert v. State, 951 P.2d 98, 103, 122 (Okla. Crim. App. 1997). The jury recommended that Gilbert be sentenced to death for Ruddell's murder, and the trial court sentenced him in accordance with this recommendation.

Gilbert appealed, raising thirteen propositions of error, but his convictions and death sentence were affirmed by the Oklahoma Court of Criminal Appeals ("OCCA"). He subsequently filed an application for post-conviction relief before the OCCA, urging eight grounds and requesting an evidentiary hearing, but this application was denied. In September 1999, Gilbert filed a petition for a writ of habeas corpus in federal district court, seeking relief on seven grounds. The petition was denied and this appeal followed.

## II

Because Gilbert filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the provisions of that act are applicable to his case. See Lindh v. Murphy, 521 U.S. 320, 326–27 (1997). Pursuant to AEDPA, we may not grant a petition for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court with respect to any claim adjudicated on the merits in state court unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court decision is an unreasonable application of federal law under § 2254(d)(2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

-4-

# A

Gilbert contends that he was denied due process of law when the trial court, at the sentencing phase of his trial, coerced the jury into recommending a death sentence by delivering a supplemental jury instruction that was intended to urge the jurors to achieve a unanimous decision. Whether a jury has been improperly coerced by a judge is a mixed question of law and fact. Rodriguez v. Marshall, 125 F.3d 739, 744 (9th Cir. 1997). Pursuant to AEDPA we may grant habeas relief on such a claim only if the state court unreasonably applied the law to the facts of the case. Williams, 529 U.S. at 413.

Jury deliberations for the sentencing phase of Gilbert's trial began at 4:40 p.m. on a Thursday. At approximately 10:00 p.m., the trial court sua sponte called the jury to the courtroom "to inquire as to their progress." (7 Tr. at 1692.) The following exchange then took place between the court and the jury's foreperson:

> THE COURT: I want to ask you two or three or four questions, but listen to it carefully before you answer it, because it's important that you not give any information other than what is asked for. The first question is: Have you reached a—has the jury reached a verdict on any of the charges?
>
> THE FOREPERSON: Yes, we have.
>
> THE COURT: Are you making progress on the one or more that you have not reached a verdict on?
>
> THE FOREPERSON: I don't think so.

THE COURT: Do you think you will be able to reach a verdict on the one or more charges that you have not reached a verdict on?

THE FOREPERSON: No, sir, I don't.

THE COURT: Do not disclose the numerical division—excuse me—do not disclose which way you are leaning. Just tell me, if you would, please, on the—is there one charge or more that you have not reached—

THE FOREPERSON: Yes. sir. One charge.

THE COURT: That you have not reached a verdict on?

THE FOREPERSON: Yes.

THE COURT: Without disclosing which way the vote is leaning, tell me what the numerical division is.

THE FOREPERSON: Half and half.

. . .

THE COURT: I would like for you to go back and try a little longer. We won't leave you in there this long without inquiring further. But at this time I would ask you to go back and try again on the remaining charge.

(7 id. at 1693–94.)

At approximately 11:05 p.m., the trial court recalled the jury to the courtroom and the ensuing exchange took place:

THE COURT: Ms. Cross, may I inquire of you further.

THE FOREPERSON: Your Honor, we have not reached a decision.

THE COURT: Has the numerical division changed?

-6-

THE FOREPERSON: Yes, your Honor, it has. But there is at least one person on each side that has no intention of changing their mind and reaching a compromise.

. . .

THE COURT: Ladies and gentlemen of the jury, this case has taken approximately seven days of trial time counting the voir dire. You have deliberated, I believe, over six hours. You report to me that you are experiencing difficulty in arriving at a verdict. This is an important case and a serious matter to all concerned. You are the exclusive judges of the facts, the Court is the judge of the law.

Now, I most respectfully and earnestly request of you that you return to your jury room and resume your deliberations. Further open and frank discussion of the evidence and the law submitted to you in this case may aid you in arriving at a verdict. This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

No juror should ever agree to a verdict that is contrary to the law and the Court's instructions nor find the fact or concur in a verdict which in good conscience he or she believes to be untrue. This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in the spirit of fairness and candor.

If at all possible, you should resolve any differences and come to a common conclusion that this case may be completed. Each juror should respect the opinion of his or her fellow jurors as he or she would have them respect his or hers in an earnest and diligent effort to arrive at a just verdict under the law and the evidence. You may be as leisurely in your deliberations as the case may require and take all the time necessary.

The giving of this instruction at this time in no way means that it is more important than any other instruction. On the contrary, you should consider this instruction together with and as part of the

instructions which I have previously [given] you.

In stating the foregoing, I again repeat: You are the judges of the facts, the Court is the judge of the law. In making all statements made to you, I have not nor do I now express or intimate nor indicate in any way the conclusion to be reached by you in this case. Nor do I intend in any manner—or any way or manner to coerce a verdict not directly or indirectly to force a verdict in this case. I only ask that you return to your jury room and, again, diligently and earnestly under your oaths resume your deliberations.

I want you to know that I'm conscious of the hour; we all are. And we would like for you to try one more time. We'll talk to you again.

(7 id. at 1698–1701.) At 12:36 a.m., the jury returned to the courtroom with a verdict recommending a death sentence for Gilbert on the murder charge, along with life sentences on the two non-capital charges.

Gilbert contends that the statements quoted above demonstrate that the trial court was "unconstitutionally coercive." (Appellant's Br. at 22.) Specifically, he argues the impropriety of the court (1) sua sponte calling the jury to the courtroom to inquire about its progress, (2) inquiring about the jury's numerical division, (3) refusing to accept as final the foreperson's statements that the jury could not reach a verdict as to the sentencing decision, and (4) twice giving an Allen instruction[2] to the jury. Gilbert raised his coercion claims before the OCCA

---

[2] An Allen charge—sometimes referred to as a "dynamite charge"—derives its name from the supplemental jury instruction approved by the Supreme Court in Allen v. United States, 164 U.S. 492, 501–02 (1896).

on direct appeal and the court rejected them on the merits. Gilbert, 951 P.2d at 114–16.

In United States v. Smith, we noted that the use of a supplemental charge has long been sanctioned, explaining that the purpose of an Allen instruction is

> to encourage unanimity (without infringement upon the conscientious views of each individual juror) by urging each juror to review and reconsider the evidence in the light of the views expressed by other jurors, in a manner evincing a conscientious search for truth rather than a dogged determination to have one's way in the outcome of the deliberative process.

857 F.2d 682, 683–84 (10th Cir. 1988). We have, however, "traditionally urged caution in the use of the Allen instruction," United States v. Rodriguez-Mejia, 20 F.3d 1090, 1091 (10th Cir. 1994), and will allow such an instruction only "if it is not impermissibly coercive," United States v. Porter, 881 F.2d 878, 888 (10th Cir. 1989). In determining whether a trial court's actions have improperly coerced a jury, the Supreme Court has held that a reviewing court must look at the supplemental charge given by the judge "in its context and under all the circumstances." Lowenfield v. Phelps, 484 U.S. 231, 237 (1988) (quotation omitted). "Some of the factors we consider in making this determination include: (1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations." United States v. Arney, 248 F.3d 984, 988 (10th Cir. 2001). In our evaluation of the totality of the circumstances surrounding the trial

court's giving of the <u>Allen</u> charge, we will address each of the <u>Arney</u> factors in turn along with the particular claims urged by Gilbert.[3]

Looking first at the language of the <u>Allen</u> charge given by the trial court in the present case, we observe that the court made admirable efforts to assure that its instructions would not unduly pressure members of the jury. The court noted the serious nature of the jury's task, but urged "open and frank discussion" of the evidence and law, emphasized that no juror should "surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision," and insisted that no juror should concur in a verdict "which in good conscience he or she believes to be untrue." (7 Tr. at 1700.) In this regard, we note that the type of instruction given by the trial court has been referred to as a "modified" <u>Allen</u> charge, and that it differs from a traditional <u>Allen</u> charge in that the court asks each juror, rather than only those in the minority, to carefully reconsider their views. <u>See Arney</u>, 248 F.3d at 988. Such instructions, we have held, reduce the possibility of coercion. <u>See id.</u> In addition, the trial court stressed that each

_____

[3] Although <u>Arney</u> sets forth the factors under which a federal appellate court reviews the supplemental jury instructions used by a federal district court, we note that this standard is higher than our more deferential review pursuant to AEDPA. Because we conclude below that the trial court's <u>Allen</u> instruction was proper under the heightened federal standard, the OCCA's determination that the instruction did not abridge Gilbert's due process rights was not an unreasonable determination under AEDPA.

-10-

juror "should give respectful consideration to each other's views and talk over any differences of opinion in the spirit of fairness and candor." (7 Tr. at 1700.) We have approved of such language in the past. See, e.g., Arney, 248 F.3d at 988. We conclude that there is nothing in the language of this particular Allen charge that could be deemed coercive.[4]

Ideally, a trial court's instruction to jurors that they should listen to each other would be given at the same time that all other jury instructions are given; such a practice would avoid having the jury give disproportionate weight to the new charge. See Porter, 881 F.2d at 889. This is not, however, a per se rule; we have regularly approved the giving of supplemental Allen charges during jury deliberations. See Arney, 248 F.3d at 989 (listing cases). We conclude that in the present case the separate provision of an Allen instruction did not unduly emphasize the importance of reaching a verdict and that it was not thereby coercive.

With respect to the timing of the Allen charge, Gilbert contends in part that the trial court's instruction was coercive because it was given to the jury after the jury indicated that it was deadlocked, because the court inquired sua sponte as to

---

[4] In its instruction, the trial court also underscored that it did not intend "in any manner" to "coerce a verdict." (7 Tr. at 1701.) While such language certainly does no harm, we note that it alone will not immunize an otherwise coercive Allen charge from the scrutiny of a reviewing court.

-11-

the status of the jury before he gave the instruction, and because of the late hour at which it was given. Although we have noted that there is an "inherent danger" in giving a supplemental instruction to an "apparently deadlocked jury," Munroe v. United States, 424 F.2d 243, 246 (10th Cir. 1970) (en banc) (quotation omitted), we have also stated that this is "not a per se rule," Arney, 248 F.3d at 989; see also id. (quoting with approval 2A Charles Alan Wright, Federal Practice and Procedure § 502, at 530–31 (3d ed. 2000), for the proposition that a court "is not required to accept the judgment of a jury that it is hopelessly deadlocked, and may require it to continue deliberating," so long as the court says nothing coercive to the jury). As the passages from the trial transcript quoted above demonstrate, the jury was moving closer toward unanimity each time it was polled by the court. Although the foreperson stated, in response to queries from the court, that she did not believe the jury would reach a verdict on one of the charges (7 Tr. at 1693–94), and that "there is at least one person on each side that has no intention of changing their mind" (7 id. at 1698), we do not perceive such statements to be absolute declarations that further deliberation would be fruitless. Even if we accept Gilbert's premise that the jury actually indicated that it was deadlocked—a premise which is debatable—we conclude that this fact alone would not suffice to demonstrate that the court's charge was coercive in the present circumstances. We likewise find nothing improper in the decision of the

court to give the supplemental charge sua sponte, before a request by counsel and without any prompting from the jury that it perceived itself to be deadlocked. Cf. Rodriguez-Mejia, 20 F.3d at 1092 (stating that it is proper to give an Allen instruction even without evidence of jury deadlock).

Of more concern to us is the fact that the court issued the Allen charge so late in the evening, after 11:00 p.m., and that the jury was kept deliberating well past midnight. Under such circumstances there is a real danger that jurors in the minority camp will feel significant pressure to switch their votes. In the present case, our concern is somewhat enhanced due to the fact that a number of jurors had indicated to the court, before closing arguments, that their preference would be to start deliberations the next morning rather than late that day. Nonetheless, although courts should be wary of the potentially coercive effect of holding jurors late into the night and even into the early morning hours, we remain unconvinced that the court's giving of the Allen charge at such a late hour was, under the circumstances of this case, in and of itself coercive. Key to our conclusion is the fact that the court ended its charge to the jury by noting that it was "conscious of the hour," (7 Tr. at 1701), thereby clearly signaling to the jury that it would not be held indefinitely.

We next turn to the length of the jury deliberations following the Allen charge. The Supreme Court has noted that the jury's return of a verdict very soon

-13-

after the giving of an Allen instruction "suggests the possibility of coercion." Lowenfield, 484 U.S. at 240. In the present case, however, the jury deliberated for a substantial amount of time—nearly an hour and a half—after the court gave its Allen charge. We have approved Allen instructions in previous cases where the juries deliberated for far shorter periods of time, see Arney, 248 F.3d at 990 (listing cases in which Allen charges were found not to be coercive where verdicts were reached eighty minutes, sixty minutes, and forty minutes after the supplemental instruction was given), and conclude that the ninety-minute deliberation in the present case does not lead us to an inference of coercion.

Gilbert also argues that the trial court effectively gave multiple Allen charges to the jury, heightening the level of coercion. At least one circuit court has held that the giving of multiple Allen charges in a federal prosecution is improper and coercive. See United States v. Seawell, 550 F.2d 1159, 1162–63 (9th Cir. 1977). We disagree with Gilbert, however, that the trial court gave multiple Allen charges in the present case. The first time the court sent the jury back for more deliberations, it merely stated, "I would like for you to go back and try a little longer. We won't leave you in there this long without inquiring further. But at this time I would ask you to go back and try again on the remaining charge." (Appellant's Br. at 16.) This statement was not a new jury instruction and, even if it were, we do not perceive its issuance in conjunction

-14-

with the later Allen charge to have been coercive.

Gilbert finally argues that the court's Allen charge was improperly coercive when viewed in light of its prior polling of the jury regarding their numerical division as to the verdict. In Brasfield v. United States, the Supreme Court held that this type of polling was automatic grounds for reversal because such polling almost always brings to bear "in some degree, serious, although not measurable, an improper influence upon the jury." 272 U.S. 448, 450 (1926). The Court has, however, since characterized its holding in Brasfield as "an exercise of this Court's supervisory powers" over the federal courts and, by implication, not a constitutional holding with respect to due process requirements. Lowenfield, 484 U.S. at 240; see also id. at 240 n.3 ("Our decision in Brasfield makes no mention of the Due Process Clause or any other constitutional provision. The Federal Courts of Appeals have uniformly rejected the notion that Brasfield's per se reversal approach must be followed when reviewing state proceedings on habeas corpus."). The Court in Lowenfield did note that Brasfield was "instructive as to the potential dangers of jury polling," id. at 240, but it nonetheless held that the trial court's polling in that case, in combination with the Allen charge, was not coercive, id. at 241.

The Lowenfield Court emphasized that its finding of no coercion was "not mean[t] to be understood as saying other combinations of supplemental charges

-15-

and polling might not require a different conclusion." Id. Moreover, it is clear that Lowenfield is factually distinguishable in some ways from the instant case. In Lowenfield, for example, the trial court's inquiry as to the jury's numerical division was limited to whether the individual jurors felt that additional deliberation would be useful, and it did not elicit information with respect to the jury's division on the merits of the charge itself. Id. at 234. In addition, defense counsel in that case failed to object to the poll, leading the Lowenfield Court to conclude that the possibility of coercion was not obvious at the time of trial. Id. at 240. In the present case, Gilbert's defense counsel did object to the supplemental instruction.

Nonetheless, the trial court in the present case garnered only information concerning the numerical division of the jury and carefully avoided eliciting information concerning the direction in which the jury was leaning.[5] At most, the impression left with the jurors would have been that the trial court was anxious for them to reach a verdict; the jurors could not have labored under the impression that the court was interested in what their actual decision would be. Although Gilbert clearly had an interest in having the jury fail to reach a

_____

[5] Moreover, the court never learned which specific jurors were in the minority, nor did it learn the precise numerical division amongst the jurors.

-16-

unanimous verdict,[6] the Supreme Court has specifically noted that an <u>Allen</u> charge in such circumstances is permissible under the Due Process Clause because the state "has in a capital sentencing proceeding a strong interest in having the jury 'express the conscience of the community on the ultimate question of life or death.'"  <u>Id.</u> at 238 (quoting <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 519 (1968)). We therefore conclude that the trial court's polling of the jury in combination with the issuance of an <u>Allen</u> charge was not coercive.

We have considered the totality of the circumstances in which the <u>Allen</u> instruction was given in the present case, and conclude that it was not coercive in a way that denied Gilbert a fair trial and due process of law.  Accordingly, the OCCA's determination that he was not entitled to relief on his coercion claim was not unreasonable under the standards of AEDPA, and his petition for habeas relief will not be granted on this ground.

## B

Gilbert's second claim is that the trial court violated his due process rights by refusing to provide him with a competency hearing despite a request from his trial counsel.

---

[6] In a capital sentencing proceeding in Oklahoma, if the jury "cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life without parole or imprisonment for life."  Okla. Stat. tit. 21, § 701.11.

-17-

Before the trial began, Gilbert's counsel filed an application for a competency hearing. As part of that application, counsel stated that Gilbert was having difficulty understanding the court procedures, that he seemed unable to focus his attention, and that he might behave inappropriately during trial.

Pursuant to Okla. Stat. tit. 22, § 1175.2, the trial court then held a hearing to determine whether Gilbert's application for a competency hearing should be granted. During that hearing, Gilbert's counsel called Luther Grisso, an investigator for the Oklahoma Indigent Defense System ("OIDS"), to testify about Gilbert's competency. Grisso, who specialized in capital cases, had spoken with Gilbert on a number of occasions and had reviewed his psychiatric records, some of which pertained to Gilbert's "level of intellectual function." (Oct. 12, 1995 Tr. at 14.) Grisso indicated some concern about Gilbert's ability to understand the courtroom procedures, noting that Gilbert himself had told him that "he didn't understand anything that was said. He didn't understand what was going on." (Id. at 15.) In particular, Grisso testified that Gilbert was unable to comprehend the concept of a jury or why it would be present in the courtroom:

> [A]t first he didn't indicate that he knew the jury was going to be in the courtroom. After eventually convincing him that it would be, he didn't see any reason for the jury. He didn't think the jury should be judging him. . . . He didn't understand why or what their function was.

(Id. at 15–16.) Grisso also testified that after this discussion Gilbert "became

-18-

completely non-responsive," that "[h]is face just went blank," and that he "started talking about something else completely off the subject." (Id. at 16.) According to Grisso, on other occasions during his conversations with Gilbert there were times when "his mind seem[ed] to be someplace else." (Id. at 19.) As a result, Grisso concluded that he did not believe that Gilbert "will be able to go through the whole trial and be able to pay attention to everything that's going on." (Id. at 20.) He added that Gilbert had indicated that if he felt someone was not telling the truth during the trial, "he would object out loud to it." (Id. at 21.)

Although Grisso conceded that he had found no records indicating that Gilbert had previously been medicated for any mental illnesses, he noted that Gilbert's family members indicated that he had been treated with medication in the past. He also stated that a doctor had diagnosed Gilbert with attention deficit disorder, that he had been placed in special-education classes at school, and that although Gilbert was not mentally retarded, he was not of "very high intelligence." (Id. at 18–19.) Based on this information, Grisso felt a further investigation into Gilbert's competency was required. On cross-examination, however, the investigator conceded that no defendant whom he had concluded was incompetent was ultimately found to be incompetent to stand trial.

Having heard this testimony, the trial court rejected Gilbert's application for a competency hearing. It concluded there was no doubt as to Gilbert's

competency to stand trial, in part based on the court's own observation of Gilbert at various pre-trial hearings.

The leading case in this circuit with respect to evaluating the need for a competency hearing is our recent en banc decision in McGregor v. Gibson, where we noted that it is "well-settled that the 'criminal trial of an incompetent defendant violates due process,'" 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting Medina v. California, 505 U.S. 437, 453 (1992)), and that this "prohibition is fundamental to an adversary system of justice," id. (quoting Drope v. Missouri, 420 U.S. 162, 172 (1975)).[7]  In determining whether a criminal defendant is competent to stand trial, the trial court must consider "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."  Id. (quoting

_____

[7] In McGregor, the full court of this circuit took under consideration the analysis that should apply to a procedural incompetency claim where the original competency hearing had proceeded under an unconstitutional burden of proof. 248 F.3d at 953.  Although we are faced with a slightly different scenario in this case—the state trial court never held a competency hearing in the first place—the overall analysis and basic principles from McGregor nonetheless remain applicable.  This is because in McGregor we treated the competency hearing that proceeded under an unconstitutional burden of proof as if it never occurred in the first place.  Id. at 952–53.  The only significant difference between the analysis in McGregor and the analysis in the present case is that in McGregor we were able to consider the record of, and the evidence presented during, the competency hearing.  In the instant case, because no competency hearing ever occurred, there is no such record for us to rely upon.

Dusky v. United States, 362 U.S. 402, 402 (1960)).

A competency claim by a criminal defendant may implicate both substantive and procedural due process. Walker v. Attorney Gen., 167 F.3d 1339, 1343 (10th Cir. 1999). "A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, . . . while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent." McGregor, 248 F.3d at 952. As a result, a procedural incompetency claim requires a lower burden of proof as to defendant's competency than does a substantive competency claim. Id.

In McGregor, we noted that the procedural due process right to a competency hearing is grounded on the obligation of the state to provide adequate procedures to protect accused individuals from being tried while incompetent. Id. (citing Pate v. Robinson, 383 U.S. 375, 378 (1966)). In order for a habeas petitioner to prevail on a procedural competency claim, "the petitioner must establish that a reasonable judge should have had a bone fide doubt as to his competence at the time of trial. We view the evidence in the record objectively, from the standpoint of a reasonable judge presiding over petitioner's case at the time of trial." Id. at 954. The petitioner "need not establish facts sufficient to show he was actually incompetent or to show he was incompetent by a preponderance of the evidence." Id.

In determining whether there was a "bona fide doubt" as to competence, there are

> no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Drope, 420 U.S. at 180. Tenth Circuit and Supreme Court precedent, however, has established a number of factors that should be considered in making this evaluation—factors that were synthesized in McGregor. Evidence of "irrational behavior," "demeanor at trial," and "any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." McGregor, 248 F.3d at 954 (quoting Drope, 420 U.S. at 180). Evidence of "mental illness and any representations of defense counsel about the defendant's incompetence" also may be considered. Id. (quoting Walker v. Gibson, 228 F.3d 1217, 1227 (10th Cir. 2000), cert. denied, 533 U.S. 933 (2001)). Although "[e]ven one of these factors standing alone may, in some circumstances, be sufficient" to find that a defendant is entitled to a competency hearing, in the end we are required to "examine the totality of the circumstances: all evidence should be considered together, no single factor 'stand[s] alone.'" Id. (quoting Drope, 420 U.S. at 180).

Finally, we note that our review of the factual findings made by the state

court in the course of its determination of the need for a competency hearing is subject to AEDPA's "unreasonable determination" of the facts standard of § 2254(d)(2).[8]  The state court's ultimate determination that a competency hearing was unnecessary is, however, a question of law to be reviewed pursuant to § 2254(d)(1)'s "contrary to, or . . . an unreasonable application of, clearly established federal law" standard.  See Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1256 (11th Cir. 2002); Sanchez v. Gilmore, 189 F.3d 619, 623 (7th Cir. 1999).

Gilbert's claim that he was unable to understand court procedures and to comprehend the proper role of the jury could, if established, qualify as incompetence under the standard that the defendant must have "a rational as well as factual understanding of the proceedings against him."  McGregor, 248 F.3d at 952 (quoting Dusky, 362 U.S. at 402).  Presumably, if Gilbert were incapable of grasping the role of the jury in the courtroom then he could have no rational

---

[8]  Gilbert argues that we are "not bound by the state trial judge's conclusion regarding Mr. Gilbert's competency" (Appellant's Br. at 53), citing Sena v. N.M. State Prison, 109 F.3d 652, 655 (10th Cir. 1997), for the proposition that we need not presume the correctness of a state court's factual findings in this context. Gilbert misreads Sena.  In that case we refused to defer to the state court's factual findings because they were not evidenced by a written record and were not arrived at following a full, fair, and adequate hearing.  See Sena, 109 F.3d at 655.  In the present case the trial court made its findings in writing following a pre-competency hearing addressing the issue of whether there was any doubt as to Gilbert's competency.

understanding of the legal process that was being brought to bear upon him. In addition, the claim by Gilbert's counsel that he was having difficulty communicating with Gilbert would also, if adequately supported, establish doubt as to Gilbert's competency by raising the question of whether Gilbert "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." McGregor, 248 F.3d at 951 (quoting Dusky, 362 U.S. at 402).

In order to succeed on a procedural competency claim, however, the burden is on the petitioner to present facts that "establish that a reasonable judge should have had a bone fide doubt as to his competence at the time of trial." Id. at 954. Thus, the crucial question in the present case is whether—either at the time of the request for a competency hearing or at any later point during the proceedings—there was evidence in support of the above claims that would have been sufficient for a reasonable judge to have had a bona fide doubt as to Gilbert's competency.

As noted above, Gilbert's trial counsel did indicate that he had concerns about Gilbert's lack of competence. Although "the concerns of counsel alone are insufficient to establish doubt of a defendant's competency," Bryson, 187 F.3d at 1202, defense counsel "is often in the best position to determine whether a defendant's competency is questionable," id. at 1201. Gilbert also provided

-24-

some evidence of possible mental health problems in the form of the testimony by the OIDS investigator. Gilbert, however, provided no other evidence at the pre-competency hearing of any mental health problems, hospitalization, or medication from any point in his life. At the time of the application for a competency hearing there was neither evidence of irrational behavior by Gilbert nor any indication that Gilbert's demeanor during the pre-trial hearings betokened a lack of competence. Our independent review of the record has unearthed no evidence that Gilbert acted irrationally or in a bizarre manner at any point during the trial or sentencing. We also have found no evidence that other courts have made prior findings concerning Gilbert's lack of competence.

Having reviewed the material in the record, we conclude that the state court did not reach an unreasonable determination of the facts when it concluded that the evidence, viewed objectively, did not raise a bona fide doubt as to Gilbert's competency. The trial court based its decision in part on its observation that Gilbert was acting normally throughout the pre-trial proceedings. Cf. Sanchez v. Gilmore, 189 F.3d 619, 623 (7th Cir. 1999) (concluding that a state appellate court was not unreasonable in determining that there was no doubt as to defendant's competency despite a suicide attempt during the trial because the trial court had made independent observations of defendant's demeanor and concluded that he was competent). The only evidence provided by Gilbert as to his alleged

incompetence were the statements by his own counsel and the OIDS investigator. Cf. Bryson, 187 F.3d at 1202–03 (concluding that the OCCA was not unreasonable in determining that there was no doubt as to competency where petitioner relied solely on a conclusory affidavit by his attorney and an equivocal statement as to competency by a psychiatrist). Finally, we note that Gilbert has presented no evidence of any prior mental health problems separate from the testimony of the OIDS investigator, and that our independent review of the record reveals no abnormal behavior at any time during the proceedings. Cf. United States v. Crews, 781 F.2d 826, 833 (10th Cir. 1986) (per curiam) (finding no doubt as to competency despite evidence that defendant was "a hospitalized mental patient at the time of the alleged crime and that he suffered from . . . mental illnesses," because psychiatrists found defendant competent to stand trial).

Gilbert has not presented us with the same quantum of evidence that we have found sufficient in other cases to establish that a due-process violation has occurred. See, e.g., Barnett v. Hargett, 174 F.3d 1128, 1135–36 (10th Cir. 1999) (finding a bona fide doubt where defendant had a history of mental illness, counsel expressed its belief that defendant was presently incompetent, and there were prior findings of defendant's incompetence during the proceedings); United States v. Williams, 113 F.3d 1155, 1157–59 (10th Cir. 1997) (finding a bona fide doubt where there had been outbursts and hysteria by the defendant in court);

Williamson v. Ward, 110 F.3d 1508, 1514–17 (10th Cir. 1997) (finding counsel ineffective for not raising a competency claim where defendant had been diagnosed with and treated for mental illness); Sena v. N.M. State Prison, 109 F.3d 652, 653–55 (10th Cir. 1997) (finding grounds for a competency hearing where, even though an expert had determined defendant to be competent, defendant had previously been found incompetent by the trial court).

We therefore conclude that Gilbert has failed to meet his burden under AEDPA to show that the OCCA rendered a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[9]

---

[9] We note that the burden of providing adequate procedures to protect accused individuals from being tried while incompetent "persists throughout trial; thus, '[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.'" McGregor, 248 F.3d at 952 (quoting Drope, 420 U.S. at 181). Gilbert's arguments with respect to the court's failure to provide him with a competency hearing focus solely, however, on the evidence garnered at the October 12, 1995 pre-competency hearing; his briefs altogether fail to discuss the trial court's revisiting of the issue at his January 9, 1996 sentencing hearing. At that hearing, one of Gilbert's lawyers testified that Gilbert could not assist him in connection with the sentencing, and that in particular the lawyer was "unable to get through to [Gilbert] even what a motion for new trial was." (Jan. 9, 1996 Tr. at 17.) Also at this proceeding, the trial court examined Gilbert, posing questions designed to determine whether he understood the nature of the proceedings. At the close of this hearing, the trial court found that "there is no doubt as to the defendant's competency." (Id. at 32.) From our review of the record we conclude that there were no circumstances suggesting a change in Gilbert's behavior or interactions

(continued...)

## C

Gilbert's final claim is that the evidence was insufficient to support a finding by the jury of the two aggravating circumstances in this case—that the murder was committed to avoid arrest and that Gilbert was a continuing threat to society. As we recently noted in Hogan v. Gibson, "our precedents have not been consistent in their treatment of whether a question of sufficiency of the evidence represents a legal conclusion or a factual determination." 197 F.3d 1297, 1306 (10th Cir. 1999). Compare, e.g., Bryson, 187 F.3d at 1207 (treating a sufficiency of the evidence claim as a question of fact), with, e.g., Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995) (treating a sufficiency of the evidence claim as a mixed question of law and fact). We need not, however, determine which standard of AEDPA review to apply in the present case because under either one Gilbert's claim fails.

The Supreme Court has stated that a jury's finding on an issue will be upheld if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We conclude that the State presented more than ample evidence at trial to

---

[9](...continued)
with counsel sufficient to raise a doubt about his competency.

meet the Jackson standard with respect to both aggravating circumstances.

Under Oklahoma law, the focus of the aggravating circumstance that the murder was committed to avoid lawful arrest or prosecution is on the state of mind of the murderer; it is he who must have the purpose of avoiding or preventing lawful arrest or prosecution. See Carter v. State, 879 P.2d 1234, 1250 (Okla. Crim. App. 1994). This aggravator also requires a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution. Id. The OCCA, in concluding that there was sufficient evidence to support the jury's finding of the "avoid arrest" aggravator, stated that Gilbert

> admitted to killing one woman in Ohio and stealing her car, driving it to Missouri where an elderly couple was killed for their car, driving that car to Oklahoma where Mrs. Ruddell was killed and her pickup taken by [Gilbert] and his co-defendant to New Mexico. This is ample evidence to support the jury's finding the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution.

Gilbert, 951 P.2d at 122. Further evidence in the record in support of the "avoid arrest" aggravating circumstance includes testimony that Gilbert admitted that the victim pleaded with him to take her car and swore she would not notify police, but that Gilbert disbelieved her and killed her. (June 11, 1995 Tr. at 371.) The jury could easily have concluded from this evidence that there was no reasonable doubt that Gilbert's intent in killing Ruddell was to take her truck in order to avoid arrest for the previous murders and to eliminate a potential witness to his

-29-

stealing of Ruddell's truck. Testimony as to the conversation between Gilbert and Ruddell specifically supports such an inference as to Gilbert's intent. We therefore conclude that a rational trier of fact could have found the essential elements of this aggravating circumstance beyond a reasonable doubt and that the OCCA's determination in this regard was not unreasonable.

In order to support the "continuing threat" aggravating circumstance, the State must demonstrate a defendant will continue to present a threat to society after sentencing. Cudjo v. State, 925 P.2d 895, 902 (Okla. Crim. App. 1996). "A defendant's criminal history, the callousness of the crime, threats against others, lack of remorse, and attempts to prevent calls to the police are all factors this Court has previously considered when addressing this issue." Id. The following evidence was in the record in support of the "continuing threat" aggravating circumstance: the unadjudicated murders committed in Ohio and Missouri; prior convictions for child endangerment, theft, and breaking and entering in Ohio; and prior convictions for the unauthorized use of a motor vehicle and for embezzlement by bailee in Oklahoma. Gilbert, 951 P.2d at 122. We conclude that this evidence was likewise sufficient for a rational trier of fact to have found the essential elements of this aggravating circumstance beyond a reasonable doubt, and that the OCCA's determination in this regard was not unreasonable.

## III

The district court's dismissal of Gilbert's petition for a writ of habeas corpus is **AFFIRMED**.